[No. C013250. Third Dist. June 19, 1992.]

LEAGUE OF WOMEN VOTERS et al., Petitioners, v.
MARCH FONG EU, as Secretary of State, etc., et al., Respondents;
PETE WILSON, as Governor, etc., Real Party in Interest.

**COUNSEL**

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Roy M. Ulrich, Steven L. Mayer, Ethan P. Schulman, Katherine E. Meiss, Robert D. Newman, Richard A. Rothschild, Alan Lieberman and Lucy Quacinella for Petitioners.

Anthony L. Miller, Richard S. Nishite and Oliver S. Cox for Respondents.

Gibson, Dunn & Crutcher, Robert E. Cooper, Daniel M. Kolkey and Leanne Shaltis for Real Party in Interest.

**OPINION**

PUGLIA, P. J.—In this original proceeding, we revisit an area of the law which has become familiar judicial territory, the single-subject rule. Article II, section 8, subdivision (d) of the California Constitution reads: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." Here we consider application of this rule to an initiative measure entitled the Government Accountability and Taxpayer Protection Act of 1992 (hereafter GATPA or the initiative).

The League of Women Voters, Children Now, California Common Cause, California Homeless and Housing Coalition, and Coleen M. Jarvis (petitioners) seek a writ of mandate directing the Secretary of State and the Registrar of Voters for Sacramento and San Francisco Counties (respondents) to refrain from taking further action to place the initiative on the November 1992 ballot.[1] The real party in interest is Pete Wilson, Governor of the State of California (the Governor), the initiative's "proponent." Petitioners contend the initiative embraces two primary subjects, budget reform and welfare reform, and contains several provisions unrelated to either subject. We find no constitutional violation and shall deny the petition.

I

GATPA consists of a number of constitutional and statutory changes affecting the state budgetary process both procedurally and substantively. Procedurally, GATPA would modify the way the annual state budget is adopted and implemented and would establish mechanisms for assuring the budget remains in balance. For example, the deadline for submission of a budget proposal to the Legislature would be extended from the present January 10 to March 1. (GATPA, § 4.) If the Legislature fails to pass a budget bill by June 15, payment of legislative and gubernatorial salaries, living expenses and travel reimbursements would be suspended. If there is still no budget bill passed and signed by July 1, the Governor would be empowered to declare a "state of fiscal emergency," upon which the Governor may reinstate the budget for the prior year and unilaterally reduce expenditures (except for specified constitutionally mandated programs). Such changes would not go into effect until 30 days after submission to the Legislature and would remain operative only until a new budget is enacted. (GATPA, § 5.)

GATPA also would authorize the Governor to declare "a state of fiscal emergency" and unilaterally reduce expenses whenever at the end of any

---

[1]At the time this proceeding was commenced, the initiative was still in the signature-gathering stage. On April 27, the signed petitions were submitted to the Secretary of State for verification and counting of signatures. (Elec. Code, §§ 3516-3524.)

fiscal quarter revenues are 3 percent less than forecast, expenses are 3 percent more than forecast, or revenues are 1½ percent less *and* expenses are 1½ percent more than forecast. In the event of such a mid-year fiscal emergency, all expenditure reductions by the Governor would go into effect 30 days after submission to the Legislature and remain effective until enactment of a plan to bring revenues and expenses back into balance. (GATPA, § 5.)

During a state of fiscal emergency, the Governor would be empowered to reduce salaries of state employees not covered by a collective bargaining agreement by up to 5 percent or impose equivalent furloughs. (GATPA, § 5.)

The rationale for GATPA is set forth in section 2 of the initiative:

"Despite repeated attempts by the people to limit the size of government programs, the public sector continues to grow faster than our ability to pay for it. California's taxpayers must now work well into the fifth month of the year to earn enough income to pay all our taxes.

"This is a burden that can only become more and more onerous. The reasons why are autopilot spending programs, or entitlements—the prime engine driving California's perennial overspending.

"California's fiscal imbalance is also reflected by a growing social imbalance. In the past few years, welfare caseloads have escalated at a growth rate four times faster than our general population.

"While California's tax-receivers grow quickly in numbers, California taxpayers are starting to flee our State. This leaves California with proportionally fewer taxpayers, and State government in a perpetual budget crisis. No matter how robust our economy becomes, the State will not be able to finance existing programs at current levels with projected tax revenues.

"This is why welfare reform and budget reform are one and the same. The state's fiscal future is in jeopardy and reforms of the budget process, including reform of significant programs of public expenditure which have heretofore mandated automatic increases without regard to the capacity of the state fisc, must be adopted immediately.

"We are willing to finance essential services. We believe that the State has a responsibility to look after the welfare of individuals in need. But we declare that every citizen also has an obligation to do their [*sic*] best to contribute to the welfare of society.

"Nearly 77 percent of the State general fund budget is spent on primary and secondary education, and health and welfare programs. While education accounts for 44.9 percent of that budget, an existing constitutional initiative (Proposition 98) prohibits any substantial reduction in educational funding.

"The existing budget process is not designed to reduce spending; there is no expeditious mechanism for correcting spending during the fiscal year when revenue projections are not met or caseload growth exceeds projections.

"The people believe it is time to take our destiny in our own hands.

"In order to restore accountability to our government, we the people further find that it is necessary to reform the budget process and the welfare system and do hereby enact The Government Accountability and Taxpayer Protection Act of 1992."

Because, as the initiative states, Proposition 98 prohibits substantial reduction in funding for state education, GATPA seeks to introduce flexibility and reduce expenditures in the state welfare system, a program which constitutes a major force driving the budget out of balance yet which is still susceptible to legislative control. Flexibility is achieved by eliminating statutorily mandated cost-of-living increases in grants for Aid to Families with Dependent Children (AFDC), Supplemental Security Income/Supplemental State Program (SSI/SSP) and In-Home Supportive Services (IHSS). (GATPA, §§ 7, 8, 16-18.) Grant levels would instead become subject to annual redetermination by the Department of Social Services based on projected caseload and the amount appropriated in the annual Budget Act. (GATPA, § 12.)

GATPA also would reduce welfare expenditures. Maximum AFDC grants would be reduced 10 percent during the first six months of eligibility and an additional 15 percent thereafter. (GATPA, § 7.) Increases in AFDC grants would be prohibited for children conceived while the parents are receiving benefits, certain benefits afforded pregnant women would be eliminated, and availability of grants to teenage mothers would be restricted. (GATPA, §§ 6, 7.) GATPA would establish incentives for school attendance by teenage parents who receive AFDC and would penalize them for unexcused absences. (GATPA, § 9.) GATPA would also limit AFDC benefits to new residents of California during their first 12 months in the state to the maximum amount they could have received in the state of their prior residence. (GATPA, § 7.)

In addition to AFDC and other state grant adjustments, GATPA would affect "general assistance" benefits administered by the counties pursuant to

Welfare and Institutions Code section 17000 et seq. County boards of supervisors would be given sole discretion to set general assistance grant levels,. taking into consideration the availability of funds and the projected caseload. However, maximum levels could not be set above those available under AFDC to a family of the same size. (GATPA, § 19.) Finally, Welfare and Institutions Code section 17020 would be amended to clarify that recipients of AFDC benefits are ineligible for local general assistance.

## II

Before addressing the constitutional question, we consider several preliminary matters raised in the pleadings. The Governor has demurred to the petition on two grounds. ██ He contends the petition is not properly verified (Code Civ. Proc., § 1086) because the verification is by counsel on information and belief. The verification states: "I declare the facts alleged [in the petition] are true to my own personal knowledge, except as to matters stated as to information and belief, and as to those matters, I believe them to be true. I further declare that Petitioners are absent from the county in which I have my office."

Verification by counsel where the parties are absent from the county where counsel has his office is expressly authorized by Code of Civil Procedure section 446.[2] (*Frio* v. *Superior Court* (1988) 203 Cal.App.3d 1480, 1497-1498 [250 Cal.Rptr. 819].) Although a verification should normally relate to facts (*Star Motor Imports, Inc.* v. *Superior Court* (1979) 88 Cal.App.3d 201, 205 [151 Cal.Rptr. 721]), such facts may be stated on information and belief (*Perlman* v. *Municipal Court* (1979) 99 Cal.App.3d 568, 573 [160 Cal.Rptr. 567]). "The object of a verification is to assure good faith in the averments or statements of a party. [Citations.]" (*Frio* v. *Superior Court*, *supra*, 203 Cal.App.3d at p. 1498.) Where, as here, there is no allegation of counsel's bad faith, a claim of inadequate verification is without merit. (*Ibid.*)

Furthermore, the verification indicates the matters stated in the petition are true to counsel's personal knowledge except as stated on information and

---

[2]Code of Civil Procedure section 446 provides in relevant part:

"[W]here a pleading is verified, it shall be by the affidavit of a party, unless the parties are absent from the county where the attorney has his or her office, or from some cause unable to verify it, or the facts are within the knowledge of his or her attorney or other person verifying the same."

belief. There are no *material* allegations in the petition stated on information and belief.[3]

■ The Governor's second ground for demurrer relates to the standing of the several petitioners that are nonprofit organizations. He contends these parties are not beneficially interested in the outcome of the proceeding as they are not voters or taxpayers.

■ "Petitioner in a mandamus proceeding must demonstrate that the writ is necessary to enforce or protect a specific legal right that is clear, present, certain and substantial. [Citations.] Where, however, the question is one of public, as opposed to private, interest, and petitioner seeks performance of a public duty, it is said that the foregoing requirements of petitioner's rights and respondent's duties have been 'relaxed.' [Citations.]" (*American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 256 [109 Cal.Rptr. 22].) In such case, " 'the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced. . . .' " (*Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 98, 101 [162 P.2d 627].)[4]

■ The present matter involves issues of substantial public interest regarding the state Constitution, the state budget process and welfare entitlements. The nonprofit organizations have all been involved either in promoting the interests of those most likely to be directly affected by modifications in welfare entitlements or in lobbying or other advocacy regarding the budget process. In our view, these are appropriate parties for asserting the public rights involved in this matter.

We therefore overrule the Governor's demurrer.

---

[3]Petitioners have filed a motion for leave to file an amended petition. According to counsel, the original and amended petitions are identical except the amendment is accompanied by verifications of the petitioners rather than counsel. Because .verification by counsel is adequate, petitioners' motion to amend is moot and is therefore dismissed.

[4]The Governor argues the relaxed standing requirement recognized in *Bd. of Soc. Welfare* v. *County of L. A.* is not applicable here because the nonprofit organizations are not "citizens." We do not believe the passing reference to "citizen" in that case was intended as a limitation on who may bring an action to enforce a public right or duty. A number of subsequent Court of Appeal decisions have implicitly agreed. (See *Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 256 [226 Cal.Rptr. 361] [nonprofit corporation has standing to assert rights of minor clients in the availability of confidential reproductive health care]; *California League of Senior Citizens, Inc.* v. *Brian* (1973) 35 Cal.App.3d 443, 448 fn. 4 [110 Cal.Rptr. 809] [organizations representing recipients of adult aid programs have standing to challenge new program]; *American Friends Service Committee* v. *Procunier, supra,* 33 Cal.App.3d at p. 256 [nonprofit corporations representing the welfare of prisoners and parolees have standing to challenge rules and regulations of the Department of Correction and Adult Authority].)

■ We also reject the Governor's contention consideration of this matter should be deferred until after the election. In *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200], the court observed: "[I]t is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. [Citations.]" However, *Brosnahan* v. *Eu*, *supra*, did not impose an absolute ban on preelection review. (*California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351, 357 [245 Cal.Rptr. 916].) Indeed, the Constitution expressly contemplates preelection review. Article II, section 8, subdivision (d) states an initiative which violates the rule "may not be submitted to the electors. . . ."

In *Insurance Industry Initiative Campaign Com.* v. *Eu* (1988) 203 Cal.App.3d 961 [250 Cal.Rptr. 320], we summarily denied a petition filed April 28 of an election year raising a single-subject rule challenge. On June 30, the Supreme Court instructed us to issue an alternative writ and place the matter on calendar. (*Id.* at pp. 963-964, fn. 1.) By that date the Secretary of State had already certified the matter as qualified for the November ballot.

The instant petition was filed on April 24. Because no stay or other interim relief was requested, the Secretary of State and local election officials have remained free to proceed with preparations for placing the initiative on the November ballot. We have been advised the ballot need not be in final form for submission to the printers until August 10. We have expedited these proceedings in order to insure their resolution well in advance of that deadline in order to allow the parties adequate time to pursue further review if desired. Preelection review therefore will not disrupt the electoral process.

### III

The purpose and meaning of the single-subject rule have been recapitulated by the Supreme Court in a number of recent decisions and need no further exposition here. (See *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 512-514 [286 Cal.Rptr. 283, 816 P.2d 1309]; *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 346-349 [276 Cal.Rptr. 326, 801 P.2d 1077]; *Harbor* v. *Deukmejian* (1987) 43 Cal.3d 1078, 1096-1101 [240 Cal.Rptr. 569, 742 P.2d 1290]; *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 245-253 [186 Cal.Rptr. 30, 651 P.2d 274].) ■ "It is a fundamental precept of our law that, although the legislative power under our constitutional framework is firmly vested in the Legislature, 'the people reserve to themselves the powers of initiative and referendum.' (Cal. Const., art. IV, § 1.)" (*Amador Valley Joint*

*Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [583 P.2d 1281].) "[I]t is our solemn duty jealously to guard the sovereign people's initiative power, 'it being one of the most precious rights of our democratic process.' [Citation.] Consistent with prior precedent, *we are required to resolve any reasonable doubts in favor of the exercise of this precious right.*" (*Brosnahan* v. *Brown, supra,* 32 Cal.3d at p. 241, italics in original; accord, *Legislature* v. *Eu, supra,* 54 Cal.3d at p. 501; *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360].)

In keeping with liberal construction of the people's initiative power, a measure will be considered in compliance with the single-subject rule "if its provisions are either functionally related to one another or are reasonably germane to one another or the objects of the enactment." (*Harbor* v. *Deukmejian, supra,* 43 Cal.3d at p. 1100.) However, liberal construction of the initiative power does not mean proponents are "given blank checks to draft measures containing unduly diverse or extensive provisions bearing no reasonable relationship to each other or to the general object which is sought to be promoted. The single-subject rule indeed is a constitutional safeguard adopted to protect against multifaceted measures of undue scope. For example, the rule obviously forbids joining disparate provisions which appear germane only to topics of excessive generality such as 'government' or 'public welfare.' " (*Brosnahan* v. *Brown, supra,* 32 Cal.3d at p. 253.)

The Governor's response focuses primarily on demonstrating GATPA is "reasonably germane" to a single unifying purpose. That purpose, he contends, is budget reform, or more particularly restraining budget expenditures in order to maintain a balance with revenues. In assessing this contention, we undertake a two-step analysis. First we identify a legislative "subject" of sufficient breadth that all provisions of the initiative are reasonably germane to it. Next, we determine whether this subject is "so all encompassing, so multifaceted as to demand a conclusion of unconstitutionality." (*Brosnahan* v. *Brown, supra,* 32 Cal.3d at p. 252.)

## IV

The task of defining the object or purpose of proposed legislation resembles that undertaken by an elementary school student asked to add unlike fractions which cannot be combined until converted to the lowest common denominator. Our task is to identify the lowest common denominator of the various provisions of the initiative, i.e., the most narrowly defined object or purpose which nevertheless is sufficiently broad to encompass all such provisions.

As the Governor perceives it, "California faces a long-term budget crisis —not by reason of a temporary recession—but by reason of a dramatic shift in the balance between those who pay taxes and those who receive them. Indeed, if present trends continue, *tax recipients* will *outnumber taxpayers* in eight years (currently, there are roughly six taxpayers for every five tax recipients in California). One of the more uncontrolled areas of this imbalance is in welfare payments: Whereas in 1980, there were nearly seven taxpayers for each AFDC . . . recipient, by the year 2000, there will be only 2.94 taxpayers for each AFDC recipient; and whereas in 1964, only 1 in every 18 children under the age of 18 in California received AFDC payments, by 1989, 1 in every 6 children received such payments!" To deal with this perceived crisis, GATPA seeks to achieve a structural reform of the budget. In the Governor's view, GATPA "seeks to accomplish this through both procedural and substantive measures: (1) structural reform of the budget process to strengthen the ability to restrain expenditures and (2) structural reform of the most uncontrolled, statutory component of the skyrocketing budget: welfare. Indeed, *procedural* reform of the budget process would have been ineffective without substantive reform of one of the budget's most long-term uncontrollable statutory elements: welfare."

As previously indicated, the Governor identifies the underlying purpose of GATPA as restraining budget expenditures in order to maintain a balance with revenues. According to the Governor, this purpose is served in a number of ways. First, the basic process of arriving at a budget is modified to provide more time for preparation of the initial budget proposal and disincentives for delays in adopting the final budget. In the event of delay, the Governor is empowered to reinstate the previous budget and make adjustments as necessary to achieve a balance. This power of adjustment also arises whenever a fiscal quarter ends with revenues and expenditures at variance with projections by specified amounts.

The budget balancing objective of GATPA is also served by restoring to the government the power to make annual adjustments in expenditures under the state welfare system, which the initiative identifies as a primary engine of budgetary imbalance. Automatic cost-of-living increases for AFDC and other entitlement programs are eliminated and overall grant levels become subject to annual redetermination based on projected caseload and the amount appropriated in the budget. Flexibility is also introduced into county general assistance programs.

GATPA also reduces welfare expenditures by eliminating or restricting eligibility for certain benefits and reducing overall benefit levels during the course of eligibility. Finally, language in existing legislation is tightened to

clarify that recipients of AFDC benefits are ineligible for county general assistance.

Petitioners concede that certain parts of the welfare reform provisions in the initiative "are arguably related to the State's budget process." These include the provisions "which eliminate annual cost-of-living increases in maximum grant levels and provide for reductions of grant levels as needed to contain spending within the limits of appropriated funds." We accept these concessions and conclude more broadly that the two pivotal parts of GATPA, the procedural reform of the budget process and the substantive curtailment of welfare as one of the significant components of chronic budgetary imbalance, reasonably relate to the objective of the initiative. But petitioners contend a number of provisions of GATPA do not serve its budget balancing objective and therefore do not satisfy the reasonably germane test. They cite, for example, the provision granting monetary incentives to teenage parents to remain in school. According to petitioners, this provision effectively *increases* grant levels, making it more difficult to achieve a balanced budget. The Governor suggests instead that this provision will "encourage teen parents to complete their high school education so as to learn the skills necessary for employment and thereby stay off the welfare rolls."

Petitioners also question the relationship to the purpose of GATPA of the provision modifying the criteria by which county general assistance levels are set. GATPA would amend Welfare and Institutions Code section 17000 to grant county boards of supervisors discretion to set levels according to available funds and projected caseload, but with an upper limit set at the state AFDC level for a family of the same size. According to petitioners, this provision would at best have no effect on state expenditures, because general assistance is funded by the counties, and at worst have a negative effect, because those who might have abandoned AFDC in favor of higher general assistance would no longer do so.

The Governor claims this provision is necessary to protect decreases in state benefits elsewhere in GATPA. According to the Governor, decreased state benefits could result in increased demand for county assistance, thereby necessitating reimbursement by the state.[5] Petitioners counter that the issue whether the state may be required to reimburse counties for increased costs

---

[5]Government Code section 17561, subdivision (a) reads: "The state shall reimburse each local agency and school district for all 'costs mandated by the state,' as defined in Section 17514." Government Code section 17514 defines "costs mandated by the state" as "any increased costs which a local agency or school district is required to incur after July 1, 1980, as a result of any statute enacted on or after January 1, 1975, . . . which mandates a new program *or higher level of service of an existing program* within the meaning of Section 6 of Article XIII B of the California Constitution." (Italics added.)

Welfare and Institutions Code section 17000 currently reads: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those

due to elimination of state eligibility has not yet been resolved.[6] Thus, according to petitioners, "whether such claims will succeed is wholly indirect and purely speculative."

Finally, petitioners cite as unrelated to GATPA's purpose the provision changing the date for submission of a proposed budget to the Legislature from January 10 to March 1. (GATPA, § 4.) The Governor contends this change is necessary to "allow a more accurate estimate of budget revenues and expenditures upon which the budget proposal is based, which, in turn, will allow a more realistic set of proposed spending reductions, and improve prospects for the timely enactment of a balanced budget."

■ The single-subject rule does not require that every provision of a measure interlock in some form of functional relationship. (*Legislature* v. *Eu, supra,* 54 Cal.3d at p. 513.) In proposing legislation, the people are not restricted to that which is narrowly crafted to meet a specific purpose; they must be permitted to deal "comprehensively and in detail with an area of law." (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46].) All the single-subject rule requires is for each provision of a measure to be reasonably germane to the measure's underlying purpose. "A provision which conduces to the act, or which is auxiliary to and promotive of its main purpose, or has a necessary and natural connection with such purpose is *germane* within the rule . . . ." (*Evans* v. *Superior Court* (1932) 215 Cal. 58, 63 [8 P.2d 467]; accord, *Amador Valley Joint Union Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 230; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 92-93 [207 P.2d 47].)

In *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d 245, the court rejected a single-subject challenge to Proposition 99, the "Tobacco Tax and Health Protection Act of 1988," (at p. 248) despite the inclusion of provisions only collaterally related to the object of the initiative. Proposition 99 increased the tax on cigarettes and other tobacco products and allocated some of the resulting revenue to the mitigation of various tobacco-related problems. The stated objective of the measure was " 'to

---

incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." According to the Governor, statutory changes under GATPA which cause decreased state welfare eligibility could result in increased levels of county assistance. Under the foregoing statutory scheme, this might require the state to reimburse the counties, thereby implicating state budgetary concerns.

[6]According to petitioners, this issue is currently before the Second District Court of Appeal in *County of Los Angeles* v. *State of California,* No. B049625.

reduce the economic costs of tobacco use in California . . . .'" (*Id.* at p. 253.)

In addition to dedicating some tobacco tax proceeds to various tobacco-related problems, Proposition 99 permitted revenue generated by the tobacco tax to be used for " '[p]rograms for fire prevention; environmental conservation; protection, restoration, enhancement, and maintenance of fish, waterfowl, and wildlife habitat areas; and enhancement of state and local park and recreation purposes.' " (53 Cal.3d at p. 254.) The court indicated: "Obviously, it is possible to imagine expenditures that would fall within Proposition 99's spending categories without addressing tobacco-related problems. However, the measure's spending provisions direct new revenues more precisely to tobacco-related problems than if the electorate had simply omitted any such provisions. We do not believe the voters' failure to require even greater precision invalidates the measure, since it is well established that an initiative may have 'collateral effects' without violating the single-subject rule. [Citations.]" (*Ibid.*)

In *Legislature* v. *Eu, supra,* 54 Cal.3d 492, the petitioners challenging Proposition 140, "The Political Reform Act of 1990," (*id.* at p. 499) argued it was broader than necessary to achieve its stated goal of legislative reform. Petitioners observed the legislation imposed term limitations on various constitutional officers not part of the Legislature. Petitioners also argued limitations on pension rights would not effectively assist in achieving incumbency reform. The court responded: "Petitioners appear to be confusing germaneness with functional relationship. As we have previously held, the single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough that the various provisions are reasonably related to a common theme or purpose. [Citations.] [¶] . . . [¶] Whether or not these various provisions are wise or sensible, and will combine *effectively* to achieve their stated purpose, is not our concern in evaluating the present single-subject challenge. [Citations.] Sensible or not, the separate aspects of Proposition 140 relate to the furtherance of a common purpose." (54 Cal.3d at pp. 513-514, italics in original.)

Whether extending the time when the Governor must submit his budget proposal to the Legislature or granting counties discretion in setting general assistance levels will respectively expedite adoption of a balanced budget and avoid state reimbursement of increased county expenditures are not our concern in assessing a single-subject challenge. Rather, these are questions "properly confided to the electorate." (*Insurance Industry Initiative Campaign Com.* v. *Eu, supra,* 203 Cal.App.3d at p. 967.) "[W]e do not review initiatives by attempting to predict whether each section actually will

further the initiative's purpose. Instead, we inquire only whether the provisions are 'reasonably germane' to the general purpose or objective of the initiative." (*Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 841-842 [258 Cal.Rptr. 161, 771 P.2d 1247].) In our view, both of these provisions, as well as those providing incentives for teenage parents to stay in school and setting upper limits for county general assistance, are reasonably germane to the initiative's budget balancing objective.

We thus conclude the individual provisions of the initiative are "reasonably germane" to its stated purpose of balancing the budget by structural budget reform and restraining expenditures. We now consider whether this purpose is overly broad.

## V

■ The permissible breadth of initiative subjects has been demonstrated in several recent Supreme Court decisions. In *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, the court rejected a single-subject challenge to the "Political Reform Act of 1974." The subject legislation contained more than 20,000 words addressing such subjects as establishment of a Fair Political Practices Commission, disclosure of candidate financial support, limitations on campaign spending, lobbyist activities, conflicts of interest, voter pamphlets, candidate ballot statements, and auditing. (*Id.* at pp. 37, 40.) The court held all of these matters were reasonably germane to the single subject of "political practices," which the court considered not so overly broad as to require invalidation under the single-subject rule. (*Id.* at p. 43.)

In *Brosnahan* v. *Brown, supra,* 32 Cal.3d 236, the court upheld Proposition 8, the "Victims' Bill of Rights," despite the wide variety of topics covered in the initiative. Included were sections relating to victim restitution, safe schools, admissibility of evidence, bail, prior convictions, insanity and diminished capacity defenses, habitual criminals, the right of victims to appear and express views regarding the crime and the defendant, plea bargaining, and the sentencing of youthful offenders. (*Id.* at pp. 242-245.) All of these topics were viewed as included within the single subject of "promoting the rights of actual or potential crime victims." (*Id.* at p. 247.) According to the initiative's preamble, this goal would be accomplished by "achieving more severe punishment for, and more effective deterrence of, criminal acts, protecting the public from the premature release into society of criminal offenders, providing safety from crime to a particularly vulnerable group of victims, namely school pupils and staff, and assuring restitution for the victims of criminal acts." (*Ibid.*) The court thus found no violation of the single-subject rule. (*Id.* at p. 253.)

In *Raven* v. *Deukmejian, supra*, 52 Cal.3d 336, the court considered Proposition 115, the "Crime Victims Justice Reform Act." As with Proposition 8, Proposition 115 contained provisions relating to various topics, including postindictment preliminary hearings, constitutional construction, the right of the prosecution to a speedy trial, joinder and severance, hearsay evidence in preliminary hearings, discovery in criminal proceedings, voir dire, felony murder and special circumstance murder, the new crime of torture, appointed counsel, and continuances. (*Id* at pp. 342-345.) Relying on *Brosnahan* v. *Brown, supra*, 32 Cal.3d 236, the court again found the varied provisions united to the single subject of promoting the rights of actual and potential crime victims, which was again viewed as not so overly broad as to require judicial intervention. (*Id.* at p. 347.)

In its most recent consideration of the single-subject rule, *Legislature* v. *Eu, supra*, 54 Cal.3d 492, the court rejected a challenge to Proposition 140, "The Political Reform Act of 1990." Among other things, the initiative imposed term limitations on state legislators and various state constitutional officers, set a budgetary limitation for the Legislature and imposed limitations on legislator pension rights. According to the court, "[t]he unifying theme or common purpose of Proposition 140 [was] incumbency reform, a subject not excessively general when compared with prior measures upheld by this court." (54 Cal.3d at p. 512.)

In *Harbor* v. *Deukmejian, supra*, 43 Cal.3d 1078, the court upheld a single-subject rule challenge.[7] The legislation there amended, repealed or added approximately 150 sections in more than 20 codes and legislative acts. It was described "as a 'trailer bill' which 'trails' the budget bill and is closely related to it." (43 Cal.3d at p. 1097.) The petitioners suggested "the subject of [the bill] [was] 'fiscal affairs,' as stated in its title, and [ ] its object [was] 'to make statutory adjustments which relate to the ongoing allocation of state funds appropriated annually in the budget bill, within the state programs so funded.' " (43 Cal.3d at p. 1100.) The court ruled: "Our unanimous determination in *Brosnahan, supra*, 32 Cal.3d 236, that a bill which encompasses matters of 'excessive generality' violates the purpose and intent of the single subject rule is applicable to this assertion. 'Fiscal affairs' as the subject of [the bill] and 'statutory adjustments' to the budget as its object suffer from the same defect. They are too broad in scope if, as petitioners appear to claim, they encompass any substantive measure which has an effect on the budget. The number and scope of topics germane to 'fiscal affairs' in this

---

[7]Although *Harbor* dealt with the single-subject rule applicable to legislative enactments (Cal. Const., art. IV, § 9), "the same principles apply to the single subject rule relating to initiatives as to legislative enactments." (*Harbor* v. *Deukmejian, supra*, 43 Cal.3d at p. 1098; *Fair Political Practices Com.* v. *Superior Court, supra*, 25 Cal.3d at p. 42.)

sense is virtually unlimited. If petitioners' position were accepted, a substantial portion of the many thousand statutes adopted during each legislative session could be included in a single measure even though their provisions had no relationship to one another or to any single object except that they would have some effect on the state's expenditures as reflected in the budget bill. This would effectively read the single subject rule out of the Constitution." (43 Cal.3d at pp. 1100-1101.)

Petitioners contend *Harbor* is controlling here because budget balancing through reductions in expenditures is comparable to "fiscal affairs." They argue the Supreme Court so indicated in a footnote to *Harbor* in which the Court rejected dictum in one of our earlier decisions, *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773 [189 Cal.Rptr. 212]. There, we suggested, also in a footnote: "[U]nder the broad 'reasonably germane' test . . . the single-subject requirement is met if the legislation under scrutiny exhibits a single scheme whereby its various provisions interrelate sufficiently to achieve a common underlying purpose. Here, the provisions of chapter 115 do interrelate and are promotive of a common purpose—balancing the state budget." (139 Cal.App.3d at p. 780 fn. 3.)

We do not read the passing comment in *Harbor* as precluding budget balancing as a sufficiently narrow single subject. Both *Harbor* and *Valdes* v. *Cory* referred to budget balancing only in the sense that all provisions relating to fiscal affairs, i.e., revenues and expenditures, have an effect on balancing the budget. The legislation at issue in *Harbor* was a grab-bag of unrelated provisions with no relation to the budget process except as a means of reducing expenditures or raising revenues. They had no unifying, budget balancing theme and were not designed for that end.

The present matter is distinguishable because here the initiative contains provisions expressly relating to the budget process, creating procedural mechanisms for obtaining and maintaining a balanced budget and authorizing the Governor and Legislature to adjust particular expenditures to match revenues. Attaining a balanced budget is the overall theme and driving purpose of the measure, with effects on specific expenditures only a necessary predicate.

Unlike the legislation before the court in *Harbor*, the object of GATPA is not so excessively general as to violate the single-subject rule. The object is not simply "fiscal affairs" or "statutory adjustments" to the budget. GATPA would provide substantive and procedural mechanisms to enact and maintain a *balanced* budget. This is accomplished through procedural adjustments to the budget process and procedural as well as substantive modifications to

what is identified in the initiative as one of the most egregious "budget busters," the state welfare system. In our view, this is not one of those "rare occasions similar to that which prompted the people's adoption of the single-subject initiative rule . . ." (*Brosnahan* v. *Brown, supra*, 32 Cal.3d at p. 252) in which judicial intervention is justified.

Petitioners nevertheless seek to bolster their claim of a single-subject violation by arguing GATPA is both confusing and an example of "logrolling." The initiative is confusing, they argue, because its findings and declarations focus on its welfare reform aspects and virtually ignore the provisions shifting budget power from the Legislature to the Governor. Similarly, petitioners argue the initiative attaches the budget power-shifting provisions to "the coattails" of the "apparently popular welfare provisions."

Because we conclude the initiative satisfies the single-subject rule, there is no basis for the claims of confusion and logrolling. (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra*, 53 Cal.3d at p. 255.) The single-subject rule is designed specifically to guard against these concerns. (*Ibid.*) Consequently, if proposed legislation conduces to a single subject, logrolling and confusion are not an issue. Furthermore, we do not lightly assume voters will be misled by proposed legislation the full text of which will be laid before them. (*Brosnahan* v. *Brown, supra*, 32 Cal.3d at p. 252; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra*, 22 Cal.3d at pp. 243-244.) It has been consistently held "the single-subject rule does not require a showing that each one of a measure's several provisions [is] capable of gaining voter approval independently of the remaining provisions. The possibility that some voters [object] to some parts of a measure . . . 'is inherent in any initiative containing more than one sentence. . . . The enactment of laws whether by the Legislature or by the voters in the last analysis always presents the issue whether on balance the proposed act's benefits exceed its shortcomings.' " (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra*, 53 Cal.3d at p. 255, citations omitted.)

We therefore reject petitioners' claim GATPA violates the single-subject rule. Accordingly, the petition for writ of mandate is denied and the alternative writ is discharged. Respondents and real party in interest are to recover costs.

Sparks, J., and Nicholson, J., concurred.

Petitioners' application for review by the Supreme Court was denied August 27, 1992. Kennard, J., did not participate therein. Mosk, J., and Baxter, J., were of the opinion that the application should be granted.