[No. S083194. Dec. 13, 1999.]

SENATE OF THE STATE OF CALIFORNIA et al., Petitioners, v.
BILL JONES, as Secretary of State, etc., et al., Respondents;
EDWARD J. COSTA, Real Party in Interest.

## COUNSEL

Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen, Kathleen J. Purcell, James C. Harrison and Thomas A. Willis for Petitioners.

Lloyd W. Pellman, County Counsel, and Halvor S. Melom, Principal Deputy County Counsel, for Respondent Conny B. McCormack, Los Angeles County Registrar of Voters.

William P. Wood, Oliver S. Cox, Pamela Giarrizzo; Knox, Lemmon & Anapolsky, Thomas S. Knox, Glen C. Hansen and John L. Gibson III for Respondent Bill Jones, Secretary of State of the State of California.

Stephen R. Barnett; Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Thomas W. Hiltachk and James F. Sweeney for Real Party in Interest.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Respondents and Real Party in Interest.

Ernest Dynda for United Organization of Taxpayers as Amicus Curiae on behalf of Respondents and Real Party in Interest.

T. Anthony Quinn as Amicus Curiae on behalf of Respondents and Real Party in Interest.

## OPINION

GEORGE, C. J.—Petitioners, the Senate of the State of California, the President Pro Tempore of the California Senate, and the State Superintendent of Public Instruction, filed this original proceeding in this court on October 28, 1999, seeking a writ of mandate or prohibition to restrain respondents, the Secretary of State of California and the Registrar of Voters

for the County of Los Angeles, from placing an initiative measure, recently designated as Proposition 24, on the March 7, 2000, election ballot or in the ballot pamphlet. Edward J. Costa, the proponent of the challenged measure, is named as real party in interest. The petition maintains that Proposition 24 is invalid on three separate grounds, including a claim that the measure violates the single-subject rule set forth in article II, section 8, subdivision (d), of the California Constitution (hereafter article II, section 8(d)).

Because article II, section 8(d), explicitly provides that "[a]n initiative measure embracing more than one subject *may not be submitted to the electors* or have any effect" (italics added), and because this court, after reviewing the petition and the opposition filed by the proponent, determined that petitioners had made a strong prima facie showing that the challenged measure embraces more than one subject, we issued an order to show cause on November 10, 1999, and established an expedited briefing and oral argument schedule to permit the court to resolve this matter prior to the date that the March 7, 2000, ballot pamphlet is scheduled to be submitted to the State Printer.

After consideration of the pleadings and briefs filed on behalf of the parties and amici curiae, and the presentations at oral argument, we conclude that the challenged measure violates the single-subject rule embodied in article II, section 8(d), and, accordingly, that it may not be submitted to the voters. As we shall explain, the provisions of this initiative measure are not "reasonably germane" to a single subject as required by the prior decisions of this court interpreting article II, section 8(d), but instead embrace at least two separate and unrelated subjects: (1) transfer of the power to reapportion state legislative, congressional, and Board of Equalization districts from the Legislature to the California Supreme Court, and (2) revision of provisions relating to the compensation of state legislators and other state officers. The combination—in a single initiative measure—of provisions addressing these separate subjects, and seeking to accomplish these diverse objectives, clearly violates the language and purpose of the single-subject limitation contained in article II, section 8(d). Accordingly, for the reasons more fully set forth below, we grant the requested relief, directing respondents not to include the challenged measure in the ballot pamphlet or on the election ballot for the March 7, 2000, election.

I

We begin by summarizing the terms of Proposition 24. (A copy of the complete text of the initiative measure, preceded by the title and summary provided by the Attorney General, is set forth in an appendix to this opinion.)

Section 1 sets forth the title of the initiative chosen by its drafters, indicating that the measure shall be known and may be cited as the "Let the Voters Decide Act of 2000."

Section 2 sets forth the "Findings and Declarations of Purpose" underlying the initiative measure. Subdivision (a) of that section declares generally that the Legislature "should be responsive to the demands of the citizens of the state of California and not the self-interest of individual legislators" and demands "that our representative system of government be fair to all, open to public scrutiny, free of conflicts of interest and dedicated to the principle that government derives its powers from the consent of the governed." Subdivision (b) states that "[l]egislators should not be entitled to raise their own pay or draw their own districts without obtaining approval of the voters." Subdivision (c) briefly summarizes some of the reforms that ostensibly would be enacted by adoption of the measure, including "1) Salary Reform. The recent controversial pay raises must be repealed and the voters must approve any future increases; [¶] 2) No Pay if Budget is Late. Legislators should not be paid when they fail to pass a state budget on time; [¶] 3) Fair Reapportionment. Legislators must not have the unrestricted ability to draw the boundaries of their own legislative districts and the districts of our congressional representatives, offices to which they might aspire, for their own self-interest and the voters must have an opportunity to approve any redistricting plan adopted by the Legislature."

Section 3, the first substantive provision of the initiative, is entitled "Compensation of Legislators" and would amend the provisions of article III, section 8, subdivision (g), of the California Constitution in a number of respects. First, this section of the initiative would add an initial sentence to subdivision (g) to provide that "[b]eginning in the session immediately following the adoption of this Act, the annual salary of all Members of the Legislature shall be reduced to $75,000." Second, this section would delete language in subdivision (g) currently providing that *the commission shall . . . establish* the annual salary and the medical, dental, insurance, and other similar benefits of state officers" (italics added), and would add language providing that the commission *"may recommend to the Legislature* an adjustment of" the annual salary and the medical, dental, insurance, and other similar benefits of state officers (italics added), and further providing that such annual salary and benefits shall be effective "if approved by a statute, passed by . . . each house of the Legislature . . . and approved by the voters . . . at the next regular election."[1]

Section 4 of the initiative, entitled "Legislative Travel and Living Expenses," would amend article IV, section 4, subdivision (b), of the California

---

[1] Neither section 3, nor any other provision of the initiative measure, identifies "the commission" that is referred to in article III, section 8, subdivision (g), nor describes the

Constitution, to delete language currently authorizing the members of the Legislature ("two-thirds of the membership of each house concurring") to establish the travel and living expenses that a member of the Legislature may receive in connection with his or her official duties, and to provide instead that such travel and living expenses shall "not exceed $75 per day" and that "[i]n no case, shall a Member receive travel and living expenses for more than 120 days per year." The amended provision would further provide that the amount paid for travel and living expenses (commonly known as per diem expenses) may be increased if approved by a statute passed by a majority of each house of the Legislature, if the voters approve the proposed increase at the next regular election.

Section 5 of the initiative, entitled "Timely Budget," would add a new provision, subdivision (h), to article IV, section 12 of the California Constitution. Under this provision, in any year in which the Legislature fails to pass the budget bill by June 15, each member of the Legislature would forfeit any salary and reimbursement for travel or living expenses for the period between June 15 and the day the budget bill is presented to the Governor. The provision further declares that any forfeited salary or per diem expenses may be paid retroactively only if such retroactive payment is approved both by the Legislature and the voters at the next regular election.

Section 6 of the initiative, entitled "Fair Reapportionment," would amend article XXI of the California Constitution in several respects. Article XXI currently provides that in the year following the national census that takes place at the beginning of each decade, *"the Legislature* shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts . . . ." (Italics added.) (Of course, like other legislative enactments, reapportionment statutes are subject to gubernatorial veto, as well as possible legislative override.) (See *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 601 [99 Cal.Rptr. 481, 492 P.2d 385].) Section 6 of the initiative would transfer the authority to reapportion these districts from the Legislature to *the Supreme Court*, directing the Supreme Court to appoint a panel of special masters ("made up of retired federal and state judges

"state officers" whose salaries and benefits are covered by the provision. As explained below, the commission that is referred to in this provision is the California Citizens Compensation Commission, a seven-member commission appointed by the Governor, none of whose members may be a current or former officer or employee of the state. (Cal. Const., art. III, § 8, subds. (a)-(e).) The Citizens Compensation Commission was created by a constitutional amendment approved by the voters of California in June 1990. The "state officers" whose salary and benefits are currently established by this commission include the Governor, Lieutenant Governor, Attorney General, Controller, Insurance Commissioner, Secretary of State, Superintendent of Public Instruction, Treasurer, and members of the State Board of Equalization, as well as members of the Legislature. (*Id.*, § 8, subd. (*l*).)

reflecting the cultural and ethnic diversity of California") to hold public hearings to receive evidence and arguments with respect to proposed reapportionment plans, and further providing that the reapportionment plans adopted by the Supreme Court "shall be submitted to the voters for approval at the next regular election" and "shall be used for all elections unless and until rejected by the voters." The provision also would make three changes in the standards set forth in article XXI governing the reapportionment process: (1) changing the current provision that specifies that "[t]he population of all districts of a particular type shall be reasonably equal" (Cal. Const., art. XXI, § 1, subd. (b)) to provide that the population of all districts "shall be reasonably equal *in compliance with Federal law*" (italics added), (2) altering the current provision that provides that "[e]very district shall be contiguous" (*id.*, art. XXI, § 1, subd. (c)) to add that every district "shall be contiguous *and as compact as possible*" (italics added), and (3) modifying another provision that currently provides that "[t]he geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible *without violating the requirements of any other subdivision of this section*" (*id.*, art. XXI, § 1, subd. (e), italics added) by deleting the italicized language.

Finally, section 7 of the initiative measure sets forth a standard severability clause.

## II

On April 5, 1999, the proponent submitted the above initiative measure to the Attorney General for the preparation of a title and summary, a prerequisite to the circulation of an initiative petition. (Cal. Const., art. II, § 10, subd. (d); Elec. Code, § 9002.) On the same day and shortly thereafter, the proponent submitted, respectively, four additional initiative measures to the Attorney General for the preparation of a title and summary, each measure dealing wholly or in part with the subject of reapportionment.[2] On May 26, 1999, the Attorney General issued a title and a summary of the chief purpose

---

[2]Petitioners have filed supplemental exhibits in this matter, attaching the four additional initiatives that were submitted by the proponent to the Attorney General. One measure, titled the "Fair Elections Act of 2000," dealt solely with reapportionment, proposing to transfer the reapportionment power from the Legislature to the Supreme Court and providing for the appointment of special masters; this measure was submitted to the Attorney General on the same date (Apr. 5, 1999) as the measure that ultimately became Proposition 24. A second measure, titled the "Anti-Corruption Act of 2000," included provisions relating to all of the same subject areas addressed in Proposition 24 and, in addition, a section pertaining to campaign financing reform; this measure was submitted to the Attorney General on April 20, 1999. A third measure, titled the "Government Reform Act of 2000," also included provisions relating to the same matters as Proposition 24, as well as campaign finance reform, but proposed to freeze rather than reduce legislators' salaries and would not have entirely

and points of the measure that ultimately became Proposition 24. (Elec. Code, § 9004.) The title provided by the Attorney General reads: "Legislators' Compensation, Reapportionment, Initiative Constitutional Amendment[,]" and the summary briefly enumerates a number of the specific proposals contained in the initiative measure.[3]

Thereafter, the proponent of the measure began circulating petitions to qualify this initiative measure for the ballot, and notified the Attorney General that the four alternative initiative measures that he had submitted were being withdrawn.[4] On October 12, 1999, respondent Secretary of State certified that the initiative petition in question had been signed by the requisite number of qualified electors needed to place the initiative on the March 7, 2000, Primary Election ballot.

On October 28, 1999, petitioners filed this proceeding directly in this court, asserting that the initiative measure "is procedurally defective and unconstitutional" and thus should not be allowed to appear on the March 7, 2000, election ballot. The petition contends that the measure "violates three separate, fundamental precepts of initiative law," any one of which is assertedly sufficient to warrant an order by this court directing the responsible election officials not to include the measure in the ballot pamphlet or on the election ballot.

First, the petition alleges that the measure constitutes a constitutional *revision,* which may be adopted only by a constitutional convention or legislative submission, rather than a constitutional *amendment,* which may be implemented by an initiative measure. (See Cal. Const., art. XVIII, §§ 1-3; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 349 [276 Cal.Rptr. 326, 801 P.2d 1077].) In support of this argument, the petition points out that the reapportionment power has from the beginning of California statehood resided in the Legislature, and maintains that the transfer of this traditional

removed the reapportionment authority from the Legislature, instead requiring the Legislature to consider reapportionment plans established by a "Citizen's Panel" of retired state or federal judges appointed by the Supreme Court; this measure also was submitted to the Attorney General on April 20, 1999. A fourth measure, titled "Let the Voters Decide II Act of 2000," covered the same areas as Proposition 24, but would have frozen rather than reduced legislators' salaries; this measure was submitted to the Attorney General on May 10, 1999.

[3] As noted above, the text of the Attorney General's title and summary of Proposition 24 is set out in an appendix to this opinion.

[4] On June 15, 1999, the proponent notified the Attorney General that the first three alternative initiative measures, for which the Attorney General already had prepared titles and summaries, would not be circulated for the 2000 ballot and withdrew those measures. On June 17, 1999, prior to the Attorney General's issuance of a title or summary for the fourth initiative, the proponent notified the Attorney General that that initiative also would not be circulated for the 2000 ballot and withdrew that measure.

legislative function—a function that, according to petitioners, "lies at the core of our system of representative government"—to the judicial branch works such a fundamental alteration in the relative power and structural relationship of the three branches of government to be "beyond the power of a simple amendment to the Constitution and clearly requires use of the revision process."

Second, the petition maintains that the measure violates the single-subject rule set forth in article II, section 8(d). The petition asserts that the measure "embraces at least two very different subjects: [1] state officers' pay and [2] the redistricting of Congressional, Assembly, Senate, and Board of Equalization seats." According to the petition, the challenged measure involves one of the classic situations intended to be addressed by the single-subject rule: the joining of one measure in which the proponent of an initiative is primarily interested—here, the proposal to transfer the power of reapportionment from the Legislature to the Supreme Court—with an unrelated measure or measures that the proponent views as politically popular—here, the proposal to cut state legislators' salary and expenses—simply to increase the likelihood that the proponent's desired proposal will be adopted.[5] The petition maintains that because the resulting measure embraces more than one subject, under article II, section 8(d), it "may not be submitted to the electors . . . ."

Third, the petition asserts that the initiative measure, as set forth in the petitions that were circulated to qualify the measure for the ballot, contained numerous misleading statements and omissions that were reasonably likely to have misled the electors who signed the circulated petitions. In this regard, petitioners initially point out that although the "Findings and Declarations of Purpose" set forth at the outset of the initiative clearly imply that under current law legislators set their own pay ("Legislators should not be

---

[5]In this regard, petitioners point out that each of the additional proposed initiative measures submitted by the proponent to the Attorney General contemporaneously with the measure that has become Proposition 24 (see fn. 2, *ante*) contained a provision transferring the reapportionment power from the Legislature to this court, often accompanied by various additional subjects. Petitioners assert that this background "further demonstrates that any subject beyond redistricting is an additional subject, included only to support the transfer of redistricting to this Court."

The petition also appends a newspaper article containing the following passage, which includes a quotation attributed to the proponent of the initiative: "Backers acknowledge that the initiative's use of the pay cut is a ploy to garner more votes for the initiative. [¶] 'It appeals, sure. When you go to a mall—I sit there two hours a day—and ask people if they want to sign a petition to cut legislative salaries, they say, "Where do I sign?" ' said Costa. [¶] 'You say you've got a petition to set up a special master to redistrict—redistrict, not even reapportionment—they say, "What's that?" ' " (Lucas, *Pay Cut Initiative Sponsors Miffed by GOP Vote*, S.F. Chronicle (July 20, 1999) p. A17 <www.sfgate.com/wais/search> [as of Oct. 20, 1999].)

entitled to raise their own pay . . ." (Prop. 24, § 2, subd. (b)), in fact, under an amendment to the California Constitution approved by the voters in 1990, the salary and benefits of state legislators currently are not set by the Legislature but instead by the California Citizens Compensation Commission, an independent seven-person commission none of whose members may be a current or former officer or employee of the state. (Cal. Const., art. III, § 8, subds. (a)-(*l*).)[6] Second, petitioners note that although the title of section 3 of the measure ("Compensation of Legislators") suggests that the provision would affect only the compensation of *legislators*, the provision in question actually would revise the procedure for setting the salaries and benefits of the Governor, Lieutenant Governor, Attorney General, Controller, Insurance Commissioner, Secretary of State, Superintendent of Public Instruction, Treasurer, and members of the State Board of Equalization as well as legislators, and would transform the California Citizens Compensation Commission from a body that actually establishes the salary and benefits for all of these state officers into an entity that simply "may recommend to the Legislature" an adjustment of such salaries and benefits, a recommendation that takes effect only if approved by the Legislature and by the voters at the next regular election. Petitioners allege that these aspects of the initiative measure likely misled those electors who signed the circulated petitions and justify the removal of the measure from the ballot.[7]

As we shall explain, because we conclude that the initiative measure violates the single-subject rule and for this reason may not be submitted to the electors, we need not reach the questions whether the measure constitutes a constitutional "revision" rather "amendment," or whether its allegedly

---

[6]Petitioners suggest that the misleading character of the initiative measure's statement may not have been inadvertent. Petitioners point out that the text of some of the four other initiative measures submitted by the proponent of Proposition 24 to the Attorney General at approximately the same time as this measure (see fn. 2, *ante*), did not imply that legislators currently set their own pay but instead acknowledged that such pay is set "by an unelected Commission." (See proposed initiative measure titled "The Anti-Corruption Act of 2000," § 2, subd. (e)(1), submitted by proponent to Atty. Gen. (Apr. 20, 1999); proposed initiative measure titled "The Government Reform Act of 2000," § 2, subd. (e)(1), submitted by proponent to Atty. Gen. (Apr. 20, 1999).)

[7]Although petitioners do not rely upon the matter, we note that the language of the initiative is potentially confusing or misleading in at least one other respect. In discussing the reforms included in the initiative, section 2, subdivision (c)(3), entitled "Fair Reapportionment," states: "Legislators must not have the unrestricted ability to draw the boundaries of their own legislative districts . . . for their own self-interest and the voters must have an opportunity to approve *any redistricting plan adopted by the Legislature*." (Italics added.) The emphasized language suggests that under the measure the Legislature will have the authority to adopt redistricting plans, which then will be submitted to the voters for their approval. As already noted, however, the initiative actually proposes to remove the reapportionment power from the Legislature and to transfer it to the Supreme Court, with the reapportionment plans adopted by the Supreme Court subject to the approval of the voters.

misleading aspects are sufficient, in themselves, to warrant an order withholding the measure from the ballot.

### III

Before addressing the substance of the single-subject issue, we briefly discuss the question of the propriety of preelection review of that type of claim.

Although past cases have observed that "it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity [citations]" (*Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200] (*Brosnahan I*)), subsequent decisions have explained that this general rule applies primarily when a challenge rests upon the alleged unconstitutionality of the substance of the proposed initiative, and that the rule does not preclude preelection review when the challenge is based upon a claim, for example, that the proposed measure may not properly be submitted to the voters because the measure is not legislative in character or because it amounts to a constitutional revision rather an amendment. (See, e.g., *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 695-697 [206 Cal.Rptr. 89, 686 P.2d 609] [granting preelection relief when initiative measure violated article V of the federal Constitution and exceeded the scope of the initiative power]; *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 665-667 [194 Cal.Rptr. 781, 669 P.2d 17] [granting preelection relief when initiative measure violated one-reapportionment-per-decade rule]; see also *McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787] [granting preelection relief when initiative measure in its entirety constituted a constitutional revision rather than an amendment]; *Boyd* v. *Jordan* (1934) 1 Cal.2d 468 [35 P.2d 533] [granting preelection relief when initiative petition failed to contain accurate short title as required by statute]; *Clark* v. *Jordan* (1936) 7 Cal.2d 248 [60 P.2d 457, 106 A.L.R. 549] [granting preelection relief in circumstances similar to *Boyd* v. *Jordan*].)

In the case of a challenge based upon the single-subject rule, it is clear from the text of the relevant constitutional provision itself that, in an appropriate instance, preelection relief not only is permissible but is expressly contemplated. As already noted, article II, section 8(d), provides in this regard that "[a]n initiative measure embracing more than one subject *may not be submitted to the electors* or have any effect." (Italics added.)

Although, as the proponent emphasizes, in *Brosnahan I, supra*, 31 Cal.3d 1, this court declined to intervene prior to an election when a preelection challenge which included a single-subject claim was brought against Proposition 8, the decision in *Brosnahan I* itself recognized that preelection review might be appropriate upon a "clear showing of invalidity." (31 Cal.3d at p. 4.) The court's subsequent decision in *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 243-253 [186 Cal.Rptr. 30, 651 P.2d 274] (*Brosnahan II*), which resolved the merits of the single-subject challenge to that initiative after the election, makes it clear that a majority of the court in *Brosnahan I* was not persuaded that, in that instance, the challenged initiative violated the single-subject rule.

In view of the explicit language of the single-subject provision of the Constitution, which (to reiterate) specifies that an initiative embracing more than one subject "may not be submitted to the electors" (art. II, § 8(d)), we conclude that when a court determines that the challengers to an initiative measure have demonstrated that there is a strong likelihood that the initiative violates the single-subject rule, it is appropriate to resolve the single-subject challenge prior to the election. (See, e.g., *California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351, 357 [245 Cal.Rptr. 916] (*CTLA*).) Under such circumstances, deferring a decision until after the election not only will defeat the constitutionally contemplated procedure reflected in the language of article II, section 8(d), but may contribute to an increasing cynicism on the part of the electorate with respect to the efficacy of the initiative process.

As this court explained in a previous decision providing preelection review of an initiative measure: "The presence of an invalid measure on the ballot steals attention, time, and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure." (*American Federation of Labor* v. *Eu, supra*, 36 Cal.3d 687, 697.) ■■■■■ In our view, this state's experience with successful postelection challenges to initiative measures in the 15 years that have elapsed since the *American Federation of Labor* decision amply confirms the accuracy of these observations. (Accord, *Joytime Distributors and Amusement Co.* v. *State of South Carolina* (S.C., Oct. 14, 1999, No. 25007) 1999 WL 969280, *9 [" '[If an initiative measure] is facially defective in its entirety, it is "wholly unjustified to allow voters to give their time, thought, and deliberation to the question of the desirability of the legislation as to which they are to cast their ballots, and thereafter, if their vote be in the

affirmative, confront them with a judicial decree that their action was in vain . . . ." ' [Citations.]"].)[8]

■ The proponent further argues that even if preelection relief is generally available under the single-subject provision, the challenge here should be denied because of petitioners' alleged delay in filing this proceeding. The proponent relies upon the circumstances that the initiative measure was submitted to the Attorney General and that the Attorney General issued a title and summary authorizing circulation of the initiative petition a number of months prior to the filing of this challenge.

We do not believe the petition properly can be rejected on this ground. As the supplemental exhibits filed in this case illustrate (see fn. 2, *ante*), many initiative measures that are submitted to the Attorney General for title and summary and are certified for circulation are subsequently withdrawn by the proponents or do not obtain the requisite number of signatures to qualify for the ballot. It would place an unreasonable and unrealistic burden on those who may wish to challenge an initiative measure, as well as on the courts, to adopt a rule that would require any preelection challenge to an initiative measure to be brought while petitions still are being circulated and prior to the time that a measure qualifies for the ballot.

In this case, the Secretary of State on October 12, 1999, certified the challenged measure as having received the requisite number of signatures to qualify for the ballot, and petitioners filed this proceeding a little more than two weeks later, on October 28, 1999, approximately one and one-half months before the ballot pamphlet was due to be submitted to the State Printer and more than four months prior to the March 7, 2000, election. Under the circumstances, we reject the claim that the petition was unduly delayed. (See *Chemical Specialties Manufacturers Assn., Inc.* v. *Deukmejian*

---

[8]Although the proponent and the Secretary of State have advanced some additional grounds for opposing preelection relief, those contentions do not pertain to preelection review of a single-subject challenge. Thus, for example, the proponent and the Secretary of State maintain that even if the court were to agree with petitioners' contention that the reapportionment provision of Proposition 24 constitutes a constitutional revision rather than a constitutional amendment, the provision might be severable from the remainder of the initiative (see *Raven* v. *Deukmejian, supra,* 52 Cal.3d 336, 355-356), making it inappropriate to grant preelection relief to remove the entire measure from the ballot. As past decisions have recognized, however, in light of the language of article II, section 8(d), specifying that an initiative that embraces more than one subject "may not be submitted to the electors," severance is not available when an initiative measure violates the single-subject rule. (See *CTLA, supra,* 200 Cal.App.3d 351, 361-362.)

(1991) 227 Cal.App.3d 663, 672-673 [278 Cal.Rptr. 128] (*Chemical Specialties*) [rejecting claim that single-subject challenge was barred by laches when challenge was filed nine months after election].)[9]

We now turn to the merits of the single-subject challenge.[10]

## IV

██   The constitutional provision limiting initiative measures to a single subject was added to the California Constitution initially in 1948, in apparent response to a lengthy, multifaceted initiative provision that recently had been the source of considerable controversy. (See generally, *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 229 [149 Cal.Rptr. 239, 583 P.2d 1281].) The ballot argument in favor of the proposed single-subject amendment explained that the principal purpose of the amendment was to attempt to avoid confusion of either voters or petition signers and to prevent the subversion of the electorate's will. (See

---

[9]In his return, the proponent additionally asserts that petitioners lack standing because they have brought this action in their official, rather than their individual or personal, capacities. In *Legislature* v. *Eu* (1991) 54 Cal.3d 492 [286 Cal.Rptr. 283, 816 P.2d 1309], however, we entertained a similar constitutional challenge to an initiative provision brought by the Legislature in its official institutional capacity. As in that case, the initiative in question here would have a significant and direct effect upon the role and operation of the legislative branch (as well as the salary and benefits of state officers). We reject the claim that petitioners, in their institutional or official capacity, lack standing to challenge the constitutional validity of such a measure. (See also *Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658; *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638 [180 Cal.Rptr. 297, 639 P.2d 939].)

[10]In concluding that preelection review is not appropriate here even with respect to petitioners' single-subject claim, Justice Kennard's dissenting opinion pays little heed to the explicit language of article II, section 8(d), which specifically provides that an initiative measure embracing more than one subject "may not be submitted to the electors . . . ." The dissent's conclusion on this point also fails to take into account the considerable effort and many millions of dollars that both supporters and opponents of the measure would be required to expend during an election campaign in what would prove to be a futile exercise.

Further, although the dissenting opinion describes the court's action in this proceeding as a "rush to decision" (dis. opn., *post,* at p. 1169) under circumstances "leaving insufficient time for the normal deliberative process" (*id.* at p. 1172), this court historically has demonstrated its ability and willingness to resolve matters expeditiously when circumstances so require, without compromise to the deliberative process, both in election and nonelection matters. (See, e.g., *Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 751 [100 Cal.Rptr. 290, 493 P.2d 1154] [preelection relief provided when electoral deadline fell "less than a month after these proceedings were initiated"]; *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, fn. 1 [96 Cal.Rptr. 697, 488 P.2d 1] [citing cases]; *In re Attorney Discipline System* (1998) 19 Cal.4th 582 [79 Cal.Rptr.2d 836, 967 P.2d 49].) To fail to do so here would violate the constitutional command that an initiative measure that embraces more than one subject "may not be submitted to the electors . . . ."

Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, . Gen. Elec. (Nov. 2, 1948) pp. 8-9.)[11]

In the years following the adoption of this constitutional requirement in 1948, this court on numerous occasions has considered the validity of measures challenged under the single-subject rule. In the past, we have upheld a variety of initiative measures in the face of a single-subject challenge, emphasizing that the initiative process occupies an important and favored status in the California constitutional scheme and that the single-subject requirement should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern. (See, e.g., *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46] (*FPPC*) [upholding 1974 Political Reform Act (Proposition 9)]; *Brosnahan II, supra,* 32 Cal.3d 236, 245-253 [upholding the Victims' Bill of Rights (Proposition 8)]; *Raven* v. *Deukmejian, supra,* 52 Cal.3d 336, 346-349 [upholding Crime Victims Justice Reform Act (Proposition 115)]; *Legislature* v. *Eu, supra,* 54 Cal.3d 492, 512-514 [upholding the Political Reform Act of 1990 (Proposition 140)].)

In articulating the proper standard to guide analysis in this context, the governing decisions establish that " ' "[a]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, *all of its parts are 'reasonably germane'* to each other," and to the general purpose or object of the initiative.' " (*Legislature* v. *Eu, supra,* 54 Cal.3d 492, 512, original italics.) As we recently have explained, "the single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough that the various provisions are reasonably related to a common theme or purpose." (*Id.* at p. 513.) Accordingly, we have upheld initiative measures " 'which fairly disclose *a reasonable and common sense relationship among their various components in furtherance of a common purpose.*' [Citation.]" (*Id.* at p. 512, italics added.)

Although past cases have sustained numerous initiative measures against a single-subject challenge, our decisions emphatically have rejected any suggestion "that initiative proponents are given blank checks to draft measures containing unduly diverse or extensive provisions bearing no reasonable

---

[11]Of the 23 states that authorize the use of the initiative procedure for the adoption of statutes or constitutional amendments, 17 have adopted some form of single-subject rule "[t]o encourage a focus on the merits of each new measure proposed." (Dubois & Feeney, Improving the California Initiative Process: Options for Change (U. of Cal., Cal. Policy Seminar 1992) p. 24.)

relationship to each other or to the general object which is sought to be promoted. The single-subject rule indeed is a constitutional safeguard adopted to protect against multifaceted measures of undue scope." (*Brosnahan II, supra,* 32 Cal.3d 236, 253.) Thus, although we have been mindful of the importance of not improperly restricting the initiative power, our precedents clearly recognize that the single-subject requirement serves an important role in preserving the integrity and efficacy of the initiative process. In this regard, it bears emphasis that proper application and enforcement of the single-subject rule is by no means inconsistent with the cherished and favored role that the initiative process occupies in our constitutional scheme, but on the contrary constitutes an integral safeguard against improper manipulation or abuse of that process. (Accord, *Clark* v. *Jordan, supra,* 7 Cal.2d 248, 252 ["While we are of the opinion that statutes dealing with the initiative should be liberally construed to permit the exercise by the electors of this most important privilege, we are also of the opinion that statutes passed for the purpose of protecting electors from confusing or misleading situations should be enforced."].) The single-subject rule imposes no barrier to the presentation of *any* subject to the electorate, but simply precludes drafters from combining, *in a single initiative,* provisions that are not reasonably germane to a common theme or purpose. Unrelated proposals always may be placed before the voters through separate initiative measures, which may be circulated contemporaneously, affording the electorate the choice of approving all, some, or none of the distinct proposals.

As the proponent of Proposition 24 correctly observes, over the past half-century the great majority of appellate decisions that have addressed single-subject challenges to initiative measures have found that the challenged measures satisfied the single-subject rule. In two decisions of relatively recent vintage, however, the Court of Appeal concluded in each instance that the challenged initiative measure violated the single-subject requirement. (*CTLA, supra,* 200 Cal.App.3d 351; *Chemical Specialties, supra,* 227 Cal.App.3d 663.) As we shall explain, these decisions provide important guidance with respect to the proper application of the single-subject rule embodied in article II, section 8(d), and demonstrate that the rule is neither devoid of content nor as "toothless" as some legal commentaries have suggested. (See generally, Comment, *The California Initiative Process: The Demise of the Single-Subject Rule* (1983) 14 Pacific L.J. 1095; Comment, *Putting the "Single" Back in the Single-Subject Rule: A Proposal for Initiative Reform in California* (1991) 24 U.C. Davis L.Rev. 879.)

In *CTLA, supra,* 200 Cal.App.3d 351, the petitioners brought a preelection single-subject challenge against an initiative measure entitled the "Insurance Cost Control Initiative of 1988." Although the initiative was lengthy, virtually all of its provisions were reasonably germane to the subject of controlling the cost of insurance. However, one provision of the initiative measure—which the Court of Appeal noted was "located inconspicuously at

pages 52 and 53 of the [120-page] typewritten measure" (*id.* at p. 356)—bore no relation to that subject, but would have added a section to the Insurance Code providing insurance companies (and others) protection from future campaign contribution regulations that might be specifically targeted at insurers. In attempting to defend the measure against the petitioner's single-subject challenge, the insurers argued that because the initiative at issue "deals generally with the regulation of insurance industry practices and [the campaign contribution provision] relates to a specific aspect of those practices, the latter section ipso facto satisfies the 'reasonably germane' test." (200 Cal.App.3d at pp. 359-360.)

The Court of Appeal in *CTLA* rejected the insurers' argument on two grounds: "First, the express purpose of the initiative is to control the cost of insurance, not generally to regulate the practices of the insurance industry. Second, we cannot accept the implied premise of [the insurers'] analysis, i.e., that any two provisions, no matter how functually unrelated, nevertheless comply with the constitution's single-subject requirement so long as they have in common an effect on any aspect of the business of insurance. Contemporary society is structured in such a way that the need for and provision of insurance against hazards and losses pervades virtually every aspect of life. [The insurers'] approach would permit the joining of enactments so disparate as to render the constitutional single-subject limitation nugatory." (200 Cal.App.3d at p. 360.) Observing that, in its view, "the initiative is a paradigm of the potentially deceptive combinations of unrelated provisions at which the constitutional limitation on the scope of initiative is aimed" (*ibid.*), the Court of Appeal concluded that the measure violated the single-subject rule and issued an order directing the respondent election officials to refrain from taking any action to place the matter on the ballot.

In *Chemical Specialties, supra,* 227 Cal.App.3d 663, the Court of Appeal addressed a single-subject challenge to a measure, entitled the "Public's Right to Know Act" (Proposition 105 on the November 1988 ballot), that was different in form from the measure at issue in *CTLA*. Unlike the initiative in *CTLA*, Proposition 105 did not contain one unrelated provision inserted within a lengthy proposition addressing a separate subject, but instead contained a series of diverse provisions that ostensibly were related by the circumstance that each provision required public disclosure of some information. Proposition 105 mandated separate disclosure requirements for (1) household toxic products, (2) seniors' health insurance, (3) nursing homes, (4) statewide initiative or referendum campaigns, and (5) sales of stock or securities for corporations doing business with South Africa, requiring the disclosure of different information in each of these areas. (227 Cal.App.3d at pp. 666-667.)

Although the supporters of Proposition 105 asserted that all of its provisions were reasonably germane to the single subject of "public disclosure" or "truth-in-advertising," the Court of Appeal in *Chemical Specialties* rejected that argument, finding that such a subject was clearly one of "excessive generality" (227 Cal.App.3d at pp. 670-671) and was "so broad that a virtually unlimited array of provisions could be considered germane thereto and joined in this proposition, essentially obliterating the constitutional requirement." (*Id.*, at p. 671.) Instead, the Court of Appeal concluded that "[i]n actuality, the measure seeks to reduce toxic pollution, protect seniors from fraud and deceit in the issuance of insurance policies, raise the health and safety standards in nursing homes, preserve the integrity of the election process, and fight apartheid; well-intentioned objectives but not reasonably related to one another for purposes of the single-subject rule." (*Ibid.*) Accordingly, the court in *Chemical Specialties* found that the measure violated the single-subject rule and could not properly be given any effect.

■ In the present case, petitioners contend that the initiative measure here at issue exhibits many of the same fundamental flaws as the measures found invalid in *CTLA* and *Chemical Specialties*. Petitioners maintain that like the provision in *Chemical Specialties*, Proposition 24 "combines salary changes for legislators and constitutional officers with the subject of redistricting, two unrelated concepts that can only be linked by a concept so broad it could mean almost anything." And petitioners further assert that like the measure in *CTLA*, Proposition 24 contains an " 'unnatural combination of provisions . . . dealing with more than one subject' " (*Brosnahan II, supra,* 32 Cal.3d 236, 251, quoting Ruud, *"No Law Shall Embrace More Than One Subject"* (1958) 42 Minn. L.Rev. 389, 408) that have been joined together simply for improper tactical purposes, a combination that strikes at the heart of the single-subject rule's purpose of minimizing voter confusion and deception. As we shall explain, after reviewing the specific provisions of Proposition 24, we agree with petitioners' claim that the measure at issue "embrac[es] more than one subject" within the meaning of the constitutional single-subject rule.

As described above, the substantive provisions (sections 3 through 6) of Proposition 24 would make a variety of changes:

(1) Section 3 of the initiative would reduce the salary of state legislators to $75,000. (The current salary of state legislators, as established by the California Citizens Compensation Commission, is $99,000.) (See Cal. Citizens Compensation Com., Salary and Benefit Res. (Mar. 15, 1999) p. 1.) Section 3 also would revise significantly the role of the California Citizens Compensation Commission, eliminating the commission's current authority

*to establish* the salary and benefits for state legislators, state constitutional officers, and members of the Board of Equalization, and instead authorizing the commission simply *to recommend* adjustments in salary and benefits for such state officers to the Legislature. Such adjustments would become effective only if approved both by the Legislature and by the voters.

(2) Section 4 would limit the per diem allowance of state legislators for legislative travel and living expenses to $75 per day and 120 days per year, and would permit increases in the amount paid for such expenses only if approved both by the Legislature and by the voters.

(3) Section 5 provides that if the Legislature fails to pass the budget bill by the June 15 deadline, legislators shall forfeit their salary and per diem expenses until the bill is passed, and may obtain the amount forfeited only if approved both by the Legislature and by the voters.

(4) Section 6 would transfer the power to reapportion congressional, state legislative, and Board of Equalization districts from the Legislature to the Supreme Court, provides that the Supreme Court shall use special masters as specified in the provision, and requires voter approval of the reapportionment plans established by the Supreme Court. Section 6 also would revise the state constitutional standards governing reapportionment in a number of respects.

As petitioners acknowledge, although sections 3, 4, and 5 of the initiative would make a number of distinct changes with respect to the compensation of legislators and other state officers, under our precedents it appears that these provisions are reasonably germane to the subject of state officers' compensation, and properly could be joined together in a single initiative. As petitioners point out, however, the other, very significant change in the state Constitution that would be implemented by section 6 of Proposition 24— transferring the power of reapportionment from the Legislature to this court—involves an entirely different subject; reapportionment clearly is unrelated to the subject of state officers' salaries or compensation. We agree with petitioners that, when viewed from a realistic and commonsense perspective, the provisions of Proposition 24 appear to embrace at least two distinct subjects—state officers' compensation and reapportionment.

In responding to petitioners' claim that Proposition 24 embraces more than one subject, the proponent initially argues in his opposition that "[t]he various parts of Proposition 24 are reasonably germane to the general purpose of the initiative. In summary, the initiative identifies a single problem that has plagued the Legislature for decades and proposes a single

solution—voter involvement." *In essence, the proponent seeks to justify the joinder of these disparate subjects on the theory that because each of the substantive sections of Proposition 24 contains a provision for voter approval, "voter approval" properly may be viewed as the single subject to which all of the measure's provisions are reasonably germane.*

This argument is analogous to, and demonstrates the same fundamental flaw as, the unsuccessful argument that was proffered by the proponents of Proposition 105 in *Chemical Specialties, supra,* 227 Cal.App.3d 663. As noted above, in that case it was claimed that the diverse provisions dealing with toxic household products, seniors' health insurance, nursing homes, initiative or referendum advertising, and businesses dealing with South Africa, were reasonably germane to the single subject of "public disclosure" or "truth-in-advertising," because each of the provisions proposed to require public disclosure of some information as a remedy or solution to a problem in each of the separate fields covered by the proposition. As we have seen, the court in *Chemical Specialties* rejected this argument, finding that the proffered subject was a subject of excessive generality and was "so broad that a virtually unlimited array of provisions could be considered germane thereto and joined in this proposition, essentially obliterating the constitutional requirement." (*Chemical Specialties, supra,* 227 Cal.App.3d at p. 671.) The same reasoning applies here to the proponent's suggestion that the measure at issue satisfies the single-subject rule because each one of its varied sections includes a requirement of voter approval of various determinations covered by the section. As petitioners observe, *under the proponent's proposed approach, a measure would satisfy the single-subject rule even if it contained separate provisions requiring voter approval for laws dealing with "fisheries, student class-size reduction, and securities fraud."* We agree with the Court of Appeal in *Chemical Specialties* that acceptance of such a theory would "essentially obliterat[e] the constitutional requirement."

In his return, the Secretary of State suggests that the provisions of Proposition 24 can be found to be reasonably germane to a similar but ostensibly somewhat narrower subject—"voter approval of political issues." The return, however, provides no definition of the term "political issues," a phrase that could well encompass the entire range of matters dealt with by the political system. In any event, this suggestion exhibits the same flaw as the proponent's argument.

When the drafters of an initiative measure join separate provisions dealing with *otherwise unrelated* "political issues" in a single initiative, the initiative cannot be found to satisfy the single-subject rule simply because each provision imposes a requirement of voter approval, any more than if each

provision contained a remedy of money damages or a remedy of injunctive relief. As explained in *Chemical Specialties*, *supra*, 227 Cal.App.3d 663, the circumstance that provisions in an initiative dealing with entirely unrelated subjects happen to make use of a similar remedy—there "public disclosure," here "voter approval"—is not sufficient to find that the disparate provisions are reasonably germane to a single subject for purposes of the single-subject rule.

The proponent alternatively maintains that all of the provisions of Proposition 24 are reasonably germane to the objective of dealing with the problem of "legislative self-interest." As the proponent observes, one of the purposes of the proposition, as described in its findings and declaration of purpose, is to combat "the self-interest of individual legislators." (Prop. 24, § 2, subd. (a).) In this regard, the measure explicitly declares: "Legislators should not be entitled to raise their own pay or draw their own districts without obtaining approval of the voters." (*Id.*, § 2, subd. (b).)

We need not determine in this case whether an initiative matter that includes provisions dealing with a number of subject matter areas as diverse as legislator salaries and reapportionment would satisfy the single-subject requirement if each of the separate areas addressed by the provision poses a potential conflict of interest between the personal interests of legislators and the public interest. Even if we were to assume that the theme or objective of remedying "legislative self-interest" is not excessively broad and would permit the combination of such otherwise unrelated proposals, the initiative before us cannot properly be defended on this basis. Although the text of Proposition 24 obscures this point, in reality, under existing law, members of the Legislature do *not* control their own salaries (and thus cannot "raise their own pay," as the initiative implies).[12]

Under a specific provision approved by the voters in 1990, the California Constitution currently assigns that task to the California Citizens Compensation Commission, a commission whose members are appointed by the Governor (without legislative confirmation) for six-year terms and may not be current or former state officials or employees. (Cal. Const., art. III, § 8,

---

[12]As noted, in a separate argument petitioners assert that the misleading nature of the initiative petition with regard to this significant point is itself a sufficient basis upon which to disqualify the measure from the ballot. In light of our conclusion that the measure violates the single-subject rule, we need not determine whether the misleading nature of the initiative petition in itself would support an order restraining election officials from placing the measure on the ballot.

subds. (a)-(*l*).)[13] Thus, Proposition 24 would not operate to limit a preexisting authority of legislators to set their own salaries, but on the contrary would reduce the authority of the independent citizens' commission that was established in 1990 to set such salaries, transforming the commission from a body that *establishes* legislator salaries and benefits to one that simply *recommends* the appropriate compensation. Furthermore, in contrast to the initiative's professed objective, this section of Proposition 24 actually would reinvest state legislators with a direct role in the process of setting legislative salaries, albeit at the same time subjecting the legislative decision to the approval of the voters. In sum, when the existing constitutional provisions are considered, it is apparent that Proposition 24 cannot be defended as involving the single subject or theme of imposing a voter-approval requirement in areas in which legislators now may act in their own self-interest, because that theme does not apply to the provision relating to legislators' salary.

In his return, the proponent contends that even though the California Citizens Compensation Commission currently sets legislators' salaries, this provision of Proposition 24 still may be viewed as reasonably germane to the objective of combatting legislator self-interest because it was the Legislature that submitted to the voters the 1990 proposition that resulted in the creation of the commission. The proponent argues that by establishing a salary commission "made up of unelected political appointees who set salaries for the Legislature and for constitutional officers," the 1990 proposition permitted legislators "to 'divorce' themselves from any personal responsibility for accepting any raises that might be ordered, and made such salary adjustments off-limits to citizens' oversight and the power of referendum." The proponent further asserts that "[a]s a result, each legislator's pay has more than doubled since the 'commission' was created," and observes that "[p]rior to the creation of the salary 'commission,' public scrutiny and the threat of public rejection by referendum prevented significant pay increases for public officers."

Although the circumstances identified by the proponent may well demonstrate that this provision of Proposition 24 is reasonably related to the

---

[13]The governing constitutional provision further specifies the composition of the seven-member commission, providing that the commission shall consist of "(1) [t]hree public members, one of whom has expertise in the area of compensation, such as an economist, market researcher, or personnel manager; one of whom is a member of a nonprofit public interest organization; and one of whom is representative of the general population and may include, among others, a retiree, homemaker, or person of median income[;]" (2) "[t]wo members who have experience in the business community, one of whom is an executive of a corporation incorporated in this State which ranks among the largest private sector employers in this State . . . and one of whom is an owner of a small business in this State[;]" and (3) "[t]wo members, each of whom is an officer or member of a labor organization." (Cal. Const., art. III, § 8, subd. (b).)

objective of reducing legislators' salaries, they do not demonstrate that the proposed change is directed at, or reasonably can be explained as responsive to, the subject of "legislator self-interest." As the proponent's argument itself recognizes, the 1990 proposition criticized by the proponent removed ("divorced") the authority to set legislators' salaries (as well as the salaries of other state officers) from the legislators themselves, and transferred such authority to an independent commission. As previously explained, the members of the commission may not be legislators or former legislators, are appointed by the Governor (without legislative confirmation) for six-year terms, and include persons with expertise in the setting of public officer salaries.

The circumstance that the Citizens Compensation Commission has increased the annual salary of state legislators from $49,000 to $99,000 over the past eight years may simply reflect that the current figure is a fairer and more accurate measure of the appropriate compensation for such officers, taking into consideration the substantial responsibilities of the particular office and the salaries currently paid to other public officials in this state with comparable positions and responsibilities. (See Cal. Const., art. III, § 8, subd. (g) [directing commission to consider, among other factors, "[t]he amount of the annual salary [and other benefits] for other elected and appointed officials in this State with comparable responsibilities" and "[t]he responsibility and scope of authority of the entity in which the State officer serves"].)

The proponent of Proposition 24 objects to the commission's salary determination, believing that a lower figure is appropriate and that any future adjustments should be subject to voter approval. Such dissatisfaction with the commission's work product, however, does not demonstrate that the relevant provision of Proposition 24 is directed at a problem arising out of *a conflict of interest of legislators*.[14] Indeed, the proponent's argument indicates that the salary increases to which the proponent objects were subject to greater constraints when legislators themselves retained the power over salaries; as the proponent observes, prior to the establishment of the commission "public scrutiny and the threat of public rejection by referendum prevented significant pay increases for public officers." Accordingly, although the proponent's argument explains that this provision of Proposition

---

[14]At oral argument, respondent Secretary of State and the proponent suggested that Proposition 24 may be viewed as proposing a remedy for the *former* conflict of interest that existed when state legislators set their own salaries. This new remedy, they assert, would be more effective than that already provided by the Citizens Compensation Commission. An initiative measure that proposes to remedy a conflict of interest that no longer exists, however, does not bear a logical or reasonable relationship to other provisions in the measure intended to remedy problems posed by a current conflict of interest. A contrary determination clearly would thwart the purpose of the single-subject rule.

24 can be viewed as reasonably related to the objective of minimizing legislators' salaries, this argument does not establish that the provision is reasonably germane to the subject or objective of providing a check upon legislator self-interest.[15]

Finally, the proponent contends that Proposition 24 may not properly be found to violate the single-subject rule because other initiative measures that have been upheld by this court in previous cases were assertedly much broader and contained more numerous and more diverse provisions than those included in Proposition 24. In this regard, the proponent points particularly to the 1974 Political Reform Act that was upheld in *FPPC*, *supra*, 25 Cal.3d 33, and the Political Reform Act of 1990 that was sustained in *Legislature* v. *Eu*, *supra*, 54 Cal.3d 492.

In *FPPC*, the initiative at issue embodied a broad and comprehensive reform of campaign contributions and other political practices and activities, among other things creating a new entity—the Fair Political Practices Commission—to regulate and oversee political campaign activity. In concluding that the measure did not violate the single-subject rule, the court in *FPPC* found that the provisions of the measure were "reasonably germane to the subject of political practices" (25 Cal.3d at p. 43), explaining that "the voters may not be limited to brief general statements but may deal comprehensively

---

[15]Justice Kennard's dissenting opinion posits yet another potential unifying subject to which all of the provisions of Proposition 24 assertedly may be found reasonably germane: "voter control of basic conditions of state legislators' employment." (Dis. opn., *post*, at p. 1174.) In our view, however, it distorts the ordinary and common understanding of the term "conditions of employment" to characterize the provision of Proposition 24 that transfers the authority to reapportion congressional, state legislative, and Board of Equalization districts from the Legislature to the Supreme Court as a provision involving a "basic condition of state legislators' employment," comparable to provisions pertaining to legislators' salaries or per diem expenses. A provision that transfers the authority to draw district boundaries from the legislative to the judicial branch does not establish a "condition of employment" of legislators, in the common and accepted meaning of that term, any more than a provision that would change the voting age for persons eligible to vote in state elections, or expand or contract the opportunities for voter registration, properly could be described as a measure establishing a condition of employment of state legislators. Although all of these measures might affect the identity of those who are eligible to vote in a particular election, and, in a given case, might influence a legislator's "opportunit[y] for reelection, and hence job security" (dis. opn., *post*, at p. 1174), none of these measures reasonably could be viewed as establishing a "condition of employment" for legislators so as to render the provision reasonably germane, for purposes of the single-subject rule, to provisions regulating the salaries or on-the-job expenses of legislators. Indeed, as these examples indicate, under the theory set forth in the dissent virtually any proposed change in the electoral process, no matter how fundamental or far-reaching, could be combined in a single initiative with provisions reducing legislative salaries or expenses under the expansive umbrella of "basic conditions of state legislators' employment." Stretching the contours of the single-subject rule through the acceptance of such an unorthodox and idiosyncratic meaning of the term "conditions of employment" clearly would undermine the fundamental purpose of this constitutional safeguard.

and in detail with an area of the law." (*Id.* at p. 41.) Unlike Proposition 24, the measure challenged in *FPPC* did not seek to combine one major structural change in the state constitutional framework (such as the transfer of the reapportionment power from the legislative to the judicial branch) with unrelated measures (such as those reducing and revising the pay of legislators and other state officers), but instead embodied a comprehensive package of provisions that were reasonably related to a common theme of reforming political campaign practices and related activities of candidates, lobbyists, and proponents of ballot measures. Thus, in that instance, the measure properly could be viewed as one "which fairly disclose[d] a reasonable and common sense relationship among [its] various components in furtherance of a common purpose." (*Brosnahan II, supra,* 32 Cal.3d 236, 253.)

Similarly, while the initiative measure at issue in *Legislature* v. *Eu, supra,* 54 Cal.3d 492, contained a number of seemingly distinct measures (imposing term limits, reducing legislative expenditures, and limiting legislative pensions), the court, in concluding that the measure did not violate the single-subject rule, observed that "[t]he unifying theme or common purpose of Proposition 140 is incumbency reform" (*id.* at p. 512) and found that each of "the separate aspects of [the measure] relate to the furtherance of [this] common purpose." (*Id.* at p. 514.) The court explained that the various provisions of the initiative were aimed at "making an extended career in public office both less available and less attractive to incumbent legislators" (*id.* at p. 513); the term limits provisions of the measure rendered an extended career less available to incumbent legislators, and the provisions limiting legislative expenditures and reducing legislative pensions were related both to making such an extended career less available and less attractive. The provisions of Proposition 24 exhibit no similar unifying theme or common purpose, with respect to "incumbency reform" or any other shared objective, but instead simply combine a measure that would transfer the reapportionment authority from the Legislature to this court with unrelated provisions that would make various changes pertaining to the compensation of legislators and other state officers.

In sum, we conclude that the initiative measure challenged in this case violates the single-subject rule. The portion of Proposition 24 that proposes to transfer the power of reapportionment from the Legislature, where it traditionally has resided, to the Supreme Court, itself involves a most fundamental and far-reaching change in the law. Assuming (contrary to petitioners' separate contention that we do not reach) that the transfer of this traditional legislative power to this court does not rise to the level of a constitutional revision that never may be accomplished by initiative but only by a constitutional convention or legislative submission, the proposal to

adopt such a significant change nonetheless clearly represents a separate "subject" within the meaning of the single-subject rule upon which a clear expression of the voters' intent is essential. To permit the drafters of an initiative petition to combine a provision transferring the power of reapportionment from the Legislature to this court with unrelated provisions relating to legislators' pay would inevitably create voter confusion and obscure the electorate's intent with regard to each of the separate subjects included within the initiative, undermining the basic objectives sought to be achieved by the single-subject rule.

Unlike the numerous initiative measures that have been upheld against single-subject challenges in the past, the provisions of Proposition 24 are not reasonably germane to a common theme or purpose and thus do not satisfy the single-subject requirement of article II, section 8(d). If the drafters of Proposition 24 wish to place such unrelated proposals before the voters, the constitutionally permissible means to do so is through the submission and qualification of separate initiative measures, rather than the "take it or leave it" approach embodied in Proposition 24.

V

Our cases repeatedly have recognized that the initiative represents " 'one of the most precious rights of our democratic process' " (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]), and that it is the duty of the courts " 'to jealously guard this right of the people.' " (*Ibid.*) The single-subject rule of article II, section 8(d), was added to the California Constitution by the voters for the specific purpose of protecting the integrity of this "most precious right[]." By combining widely disparate measures in a single initiative measure, Proposition 24 undermines that integrity. In enforcing the command of the single-subject rule in this case, we safeguard the people's precious right of initiative from the very risks of confusion and manipulation that the rule was intended to eliminate.

Because we have concluded that Proposition 24 embraces more than one subject, article II, section 8(d), provides that the measure "may not be submitted to the electors . . . ." As past cases have explained, the language of this constitutional provision makes it clear that when an initiative measure violates the single-subject rule, severance is not an available remedy. (See, e.g., *CTLA, supra,* 200 Cal.App.3d 351, 361-362.) Under these circumstances, the California Constitution compels the court to preclude the submission of a multisubject measure to the electorate.

A peremptory writ of mandate shall issue, directing respondents to refrain from taking any steps to place Proposition 24 on the March 7, 2000, election ballot or to include the measure in the ballot pamphlet.

In light of the time constraints under which the Secretary of State is required to act, the judgment is final forthwith. (See, e.g., *Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638, 679; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 106 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029].)

Mosk, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.**—I dissent.

I cannot join the majority in its hasty decision to declare invalid, and to remove from the March 2000 election ballot, an initiative measure, Proposition 24, for which more than a million California voters have signed petitions. Because this challenge to Proposition 24 presents issues that are close and difficult, and because there has been inadequate time to give these issues the thoughtful attention and deliberation they deserve, I have not attempted to determine whether Proposition 24 is valid or invalid. Rather, consistent with this court's decision under similar circumstances in *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1 [181 Cal.Rptr. 100, 641 P.2d 200], I would deny the peremptory writ of mandate without prejudice to deciding these issues if and when the electorate enacts Proposition 24.

The court's rush to decision has been extraordinary. On October 28, 1999, this court received and filed the petition for writ of mandate challenging Proposition 24. This court then learned that a decision on the merits would need to issue by Monday, December 13, the deadline for finalizing ballot materials. Nonetheless, on November 10 this court issued an order, in which I did not join, establishing an expedited briefing schedule and directing respondents to show cause and present oral argument on Wednesday, December 8. Only eight court days elapsed between the filing of the final party brief (November 24) and oral argument. Only three court days elapsed between oral argument and the filing of the decision, which is final immediately.

Only once before, and that was 50 years ago and under very different circumstances, has this court decided the merits of a preelection single-subject challenge to an initiative. Never before has this court invalidated an initiative measure for violation of the single-subject rule. Never before has this court decided such complex issues so quickly with so little justification for haste.

I. PREELECTION REVIEW

As this court has stated, "it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures

after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity." (*Brosnahan* v. *Eu, supra,* 31 Cal.3d 1, 4; see also *Farley* v. *Healey* (1967) 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650] [stating that a court will remove an initiative from the ballot only "on a compelling showing that a proper case has been established for interfering with the initiative power"].) This court has explained the strong preference for postelection review this way: "The general rule favoring postelection review contemplates that no serious consequences will result if consideration of the validity of a measure is delayed until after an election. Under those circumstances, the normal arguments in favor of the 'passive virtues' suggest that a court not adjudicate an issue until it is clearly required to do so. If the measure passes, there will be ample time to rule on its validity. If it fails, judicial action will not be required." (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 666 [194 Cal.Rptr. 781, 669 P.2d 17].)

This court has identified a very few situations in which preelection review of a ballot measure is justified. In *Perry* v. *Jordan* (1949) 34 Cal.2d 87 [207 P.2d 47], until today this court's only preelection decision on a single-subject challenge to an initiative, the initiative's opponents had brought a preelection single-subject challenge in the superior court, which had issued an alternative writ. The initiative proponents then brought an original mandate proceeding in this court, requesting that we order the Secretary of State to put the initiative on the ballot. Because the superior court could have issued an eleventh-hour ruling barring the initiative from the ballot, we agreed to and did determine the merits, holding that the initiative did not violate the single-subject rule.

A different sort of exigent situation was presented in *Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658, which did not involve a single-subject challenge. There, this court exercised preelection review to declare invalid a proposed initiative requiring a second legislative redistricting within a 10-year period, in violation of article XXI of the state Constitution. We noted that postelection review posed particular problems because election officials would not know which districts to use while a postelection challenge was pending. Also, the measure was proposed for a special election, costing up to $15 million, which would not be held if the measure was stricken. (See also *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638 [180 Cal.Rptr. 297, 639 P.2d 939] [entertaining preelection challenge to referenda on reapportionment statutes].)

None of the circumstances identified in these prior decisions as justifying preelection review exist here. Passage of Proposition 24 would not have

posed the sort of postelection difficulties that concerned this court in *Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658. It was not the only measure to be considered at a costly special election; rather, it would have been one of many matters on a regular election ballot. Nor was there a risk of a last-minute superior court ruling barring a valid initiative, as there was in *Perry* v. *Jordan, supra,* 34 Cal.2d 87.

This court has said that preelection review is justified also if the initiative is invalid, not because of its substance, but because the electorate lacks the power to adopt it in the first instance as, for example, when the measure is not legislative in character. (*American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 695-696 [206 Cal.Rptr. 89, 686 P.2d 609] [preelection review of initiative requiring Legislature to adopt resolution asking Congress to pass a balanced-budget amendment].) But a single-subject challenge does not present this kind of generic or jurisdictional issue. Rather, a single-subject challenge requires a careful examination of the measure's particular provisions or, in other words, a review of its substance. (See *Schmitz* v. *Younger* (1978) 21 Cal.3d 90, 93 [145 Cal.Rptr. 517, 577 P.2d 652].)

Until today, the prospect that supporters and opponents of an initiative might spend "many millions of dollars" in an election campaign (maj. opn., *ante,* at p. 1156, fn. 10) has never been considered an extraordinary circumstance justifying preelection review. Because all statewide initiative campaigns are likely to be costly, reliance on this factor effectively abrogates this court's declared preference for postelection review of challenges to initiatives, substituting instead a presumption in favor of preelection review.

Absent one of the extraordinary circumstances that this court has previously identified, the decision whether to undertake preelection review of an initiative or other ballot measure requires consideration of two factors: the complexity of the issues presented and the time available to decide them. When there is ample time before an election deadline, a court may undertake preelection review involving moderately complex issues, including single-subject challenges. For instance, in *California Trial Lawyers Assn.* v. *Eu* (1988) 200 Cal.App.3d 351 [245 Cal.Rptr. 916], a Court of Appeal decision that before today was the only preelection decision invalidating a California initiative measure for a single-subject violation, the challenge was brought at such an early stage that after the court's decision the initiative proponents had time to circulate petitions for a substitute initiative measure and qualify it for the same election. (See *Insurance Industry Initiative Campaign Com.* v. *Eu* (1988) 203 Cal.App.3d 961, 963, fn. 1, 964, fn. 2 [250 Cal.Rptr. 320]; see also *League of Women Voters* v. *Eu* (1992) 7 Cal.App.4th 649, 658 [9 Cal.Rptr.2d 416] [challenge brought on April 24; ballot preparation deadline

August 10].) But when, as here, a petitioner brings a challenge to an initiative only six weeks before the ballot preparation deadline, leaving insufficient time for the normal deliberative process, a court should make a preelection ruling "only where the invalidity of the proposed measure is clear beyond a doubt." (*Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 258 [101 Cal.Rptr. 628]; see also *Bramberg* v. *Jones* (1999) 20 Cal.4th 1045, 1053 [86 Cal.Rptr.2d 319, 978 P.2d 1240] [noting that this court had declined to decide challenge brought a few weeks before ballot submission deadline even though initiative was obviously invalid].)

Although the state Constitution declares that an initiative "embracing more than one subject may not be submitted to the electors" (Cal. Const., art. II, § 8, subd. (d)), this court has never before interpreted this language as mandating preelection review. (See *Brosnahan* v. *Eu, supra,* 31 Cal.3d 1, 4-5 (conc. opn. of Broussard, J.).) Indeed, postelection review of single-subject challenges has been the norm in this court. Only once—in *Perry* v. *Jordan, supra,* 34 Cal.2d 87, which I have discussed above—has this court decided a single-subject challenge to an initiative before an election. By comparison, this court has many times decided single-subject challenges after elections. (E.g., *Legislature* v. *Eu* (1991) 54 Cal.3d 492 [286 Cal.Rptr. 283, 816 P.2d 1309]; *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245 [279 Cal.Rptr. 325, 806 P.2d 1360]; *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077]; *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247]; *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236 [186 Cal.Rptr. 30, 651 P.2d 274]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33 [157 Cal.Rptr. 855, 599 P.2d 46]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Unless the invalidity of Proposition 24 is perfectly obvious or clear beyond a doubt, preelection review is not appropriate here because, in the words of Justice Broussard, "[t]ime is lacking for the careful study and consideration, the collegial discussion, and the mutual criticism of opinion drafts which an issue of this importance requires." (*Brosnahan* v. *Eu, supra,* 31 Cal.3d 1, 5 (conc. opn. of Broussard, J.); see also *American Federation of Labor* v. *Eu, supra,* 36 Cal.3d 687, 718 (dis. opn. of Lucas, J.) [questioning the propriety or necessity of a preelection "rush to judgment" declaring an initiative invalid].)

## II.   SINGLE-SUBJECT RULE

Is it clear beyond a doubt that Proposition 24 violates the single-subject rule? Hardly. The majority opinion takes more than 10,000 words and 34

pages (in slip opinion format) to decide the issue. As I explain below, the initiative proponents, who insist that the initiative does not violate the single-subject rule as this court has consistently interpreted it, have presented plausible arguments that the majority does not persuasively rebut and that this court has not had time to fully consider.

To avoid unduly interfering with the right of initiative, this court has held that the single-subject rule should be "construed liberally." (*Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, 38.) An initiative measure satisfies the single-subject rule " ' "if, despite its varied collateral effects, all of its parts are 'reasonably germane' to each other," and to the general purpose or object of the initiative.' " (*Legislature* v. *Eu, supra,* 54 Cal.3d 492, 512, italics omitted; accord, *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d 245, 253; *Raven* v. *Deukmejian, supra,* 52 Cal.3d 336, 346; *Brosnahan* v. *Brown, supra,* 32 Cal.3d 236, 245.) It is not necessary that each of the measure's provisions "effectively interlock in a functional relationship," but only that "the various provisions are reasonably related to a common theme or purpose." (*Legislature* v. *Eu, supra,* at p. 513.)

Had it been submitted to the electorate and adopted, Proposition 24 would have amended the state Constitution—in particular article III, section 8; article IV, sections 4 and 12; and article XXI—to do all of the following: (1) roll back legislators' salaries to $75,000 per year; (2) take away the power of the California Citizens Compensation Commission to set salaries for state constitutional officers, and instead permit the commission only to make recommendations that would be acted upon by the Legislature, subject to voter approval at the next statewide election; (3) reduce legislators' per diem to $75 per day with a limit of 120 days per year; (4) forfeit legislators' salaries and per diem expenses if the Legislature fails to send a budget bill to the Governor by June 15th of any year, with any legislation to recover forfeited salary requiring voter approval; and (5) require this court in the first instance to draw up redistricting plans for legislative, Board of Equalization, and congressional districts, with the plans to then be submitted to the voters for approval.

Two of the matters that Proposition 24 addresses—legislators' salaries and reapportionment—at first blush may seem separate and unrelated. But the initiative's proponents (by which I mean both the respondents in this proceeding and the amici curiae who have filed briefs supporting Proposition 24) present coherent and substantial arguments suggesting that this first impression may well be mistaken because all the initiative's provisions are reasonably germane to a single subject within the meaning of this court's past decisions. Without endorsing these arguments, and without reciting all of them in detail, I summarize those I find most substantial.

According to the proponents, the common theme or purpose to which all of Proposition 24's various provisions are reasonably related is voter control of basic conditions of state legislators' employment. They argue that the basic conditions of any employment agreement are compensation and job security. Legislators' salaries and per diem reimbursements are their compensation. Reapportionment of legislative districts determines their opportunities for reelection, and hence job security. The proponents argue that because legislators work for the people of California, the people are in essence their employers and should have the final say, which they do not now have, on these basic employment conditions.

The proponents offer arguments to explain why each of Proposition 24's various provisions is reasonably related to the common purpose of establishing voter control over the most basic employment conditions, compensation and job security. The provision rolling back legislators' salaries to $75,000 per year establishes a base of compensation and rescinds recent salary increases that the proponents regard as excessive. The provision removing the California Citizens Compensation Commission's authority to set salaries for state officers, including legislators, substitutes a new mechanism for determining legislators' salaries under which the voters will always have the last word. The measure reducing legislators' per diem to $75 per day with a limit of 120 days per year will prevent excessive compensation under the guise of per diem reimbursement. The provision forfeiting legislators' salaries and per diem expenses if the Legislature fails to send a budget bill to the Governor by June 15th of any year, with any legislation to recover forfeited salary requiring voter approval, will ensure that legislators earn their salaries by fulfilling their basic constitutional responsibilities, and it will also deter legislators from prolonging legislative sessions beyond June 15 to collect additional per diem. Finally, requiring this court in the first instance to draw up redistricting plans for legislative, Board of Equalization, and congressional districts, with the plans to then be submitted to the voters for approval, will ensure that the voters choose their legislators rather than the legislators choosing their voters.

The proponents acknowledge that Proposition 24 will significantly affect not only legislators, but also other constitutional officers. They offer substantial arguments in defense of this aspect of Proposition 24.

First, the proponents argue that since term limits for state legislators went into effect, legislators whose terms have expired have increasingly moved to occupy other elective or appointive offices in state government. Thus, all but two of the state constitutional officers whose salaries are now set by the California Citizens Compensation Commission are former legislators. Thus,

they argue, effective control of legislators' compensation requires control of the compensation of these officers also. In a similar vein, the proponents argue that because congressional seats and positions on the Board of Equalization are attractive career moves for California legislators, those legislators should not control reapportionment of the districts for those offices, but instead this court should determine reapportionment, subject to voter approval.

Alternatively, the proponents argue that Proposition 24's impact on compensation and districting for persons other than California legislators may be defended as permissible collateral effects. (See *Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d 245, 254.) The constitutional provision under which the California Citizens Compensation Commission sets legislators' salaries (Cal. Const., art. III, § 8) includes legislators within the larger category of "state officers." Rather than drastically rewriting the provision to distinguish legislators from other state officers, the drafters of Proposition 24 accepted the provision as written and made the minimum changes necessary to vest in the voters, rather than the Commission, final authority over these salary increases.

In the same way, the state constitutional provision governing reapportionment (Cal. Const., art. XXI) lumps together state legislative, congressional, and Board of Equalization districts and imposes a single set of reapportionment for all alike. The proponents argue that rather than drastically rewriting the provision to sever state legislative district reapportionment from reapportionment for congressional and Board of Equalization districts, the drafters merely accepted the existing classification and adopted the most economical changes necessary to give the electorate final reapportionment authority over state legislative districts. Under this view, therefore, the effects on other districts are accidental or "collateral."

Finally, the proponents argue that establishing voter control over basic employment conditions, the subject to which they maintain all of Proposition 24's provisions are reasonably germane, is not excessively general in light of this court's past decisions. Subjects of at least equal breadth, in their view, that this court has found not excessively general include "incumbency reform" (*Legislature* v. *Eu, supra,* 54 Cal.3d 492, 512), "political practices" (*Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, 43), "property tax relief" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 231), criminal justice reform (*Raven* v. *Deukmejian, supra,* 52 Cal.3d 336, 347; *Brosnahan* v. *Brown, supra,* 32 Cal.3d 236), and the cost of insurance and regulation thereof (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, 842). (See also *Yoshioka* v.

*Superior Court* (1997) 58 Cal.App.4th 972, 992 [68 Cal.Rptr.2d 553] [limiting noneconomic damages for drivers who break the law]; *California Gillnetters Assn.* v. *Department of Fish & Game* (1995) 39 Cal.App.4th 1145, 1162 [46 Cal.Rptr.2d 338] [conservation of marine resources]; *League of Women Voters* v. *Eu, supra,* 7 Cal.App.4th 649, 659 [budget balancing].)

## III. OTHER ISSUES

Petitioners here, the Senate of the State of California and others, challenge Proposition 24 not only as violating the single-subject rule, but also on the grounds that its provisions amount to a constitutional revision and that it is deliberately misleading. The majority does not address the latter two grounds. Neither will I. The single-subject issue by itself is more than this court can handle properly in the time available.

## IV. CONCLUSION

Act in haste, repent at leisure. This court may well regret its precipitous decision in this case, and the unfortunate precedent it sets. Absent compelling circumstances requiring a preelection ruling—and such circumstances are absent here—a challenge to an initiative raising even moderately complex issues should not be decided before the election if doing so requires an expedited proceeding that sacrifices this court's normal deliberative process.

My vote here is not a vote for or against the validity of Proposition 24. Neither is it a vote for or against the current test under which this court evaluates single-subject challenges. Although it may be argued that this court's past decisions have been too lax in enforcing the single-subject rule (see *Brosnahan* v. *Brown, supra,* 32 Cal.3d 236, 262 (dis. opn. of Bird, C. J.); *id.* at p. 297 (dis. opn. of Mosk, J.)), a decision both revising the existing single-subject test and applying the revised test to this initiative would require even more study and deliberation than a decision under the existing test. To thoughtfully and carefully follow either path—applying the current test or devising and applying a new test—this court needs more time than it has had available to it in this case before the ballot preparation deadline.

My vote is a vote for careful judicial deliberation of complex issues of substantial importance to the people of this state. The prudent and correct course here is to defer decision on the validity of Proposition 24 until after the March 2000 election. Abandoning judicial restraint, the majority has sacrificed the prime judicial virtue of careful deliberation.

Brown, J., concurred.

APPENDIX

## Proposition 24

The Attorney General of California has prepared the following title and summary of the chief purposes and points of the proposed measure.

### LEGISLATORS' COMPENSATION, REAPPORTIONMENT, INITIATIVE CONSTITUTIONAL AMENDMENT.

Amends Constitution to reduce legislators' salary to $75,000. Provides $75.00 per day maximum payment for legislators' travel and living expenses, for up to 120 days, annually, while Legislature is in session. Allows Legislative adjustments to state officers' salaries and benefits when approved by voters. Requires forfeiture of legislators' compensation if budget not passed by June 15 of each year. Allows payment of forfeited compensation if Legislature passes and voters approve payment at next regular election. Provides for the state Supreme Court to reapportion legislative and Board of Equalization boundaries, subject to voters' approval. Summary of estimate by Legislative Analyst and Director of Finance of fiscal impact on state and local governments: The measure could result in annual savings to the state of several million dollars and unknown potential costs in the future. The net fiscal impact is unknown, but probably not significant in the context of the overall state budget.

## Text of Initiative

SECTION 1.   Title

This measure shall be known and may be cited as "Let The Voters Decide Act of 2000."

SECTION 2.   Findings and Declarations of Purpose

The People of the State of California find and declare that:

(a)   Our Legislature should be responsive to the demands of the citizens of the state of California and not the self-interest of individual legislators. We demand that our representative system of government be fair to all, open to public scrutiny, free of conflicts of interest and dedicated to the principle that government derives its powers from the consent of the governed.

(b)   Legislators should not be entitled to raise their own pay or draw their own districts without obtaining approval of the voters.

(c)   Therefore the voters enact reforms which include:

1)   Salary Reform. The recent controversial pay raises must be repealed and the voters must approve any future increases;

2)   No Pay if Budget is Late. Legislators should not be paid when they fail to pass a state budget on time;

3)   Fair Reapportionment. Legislators must not have the unrestricted ability to draw the boundaries of their own legislative districts and the districts of our congressional representatives, offices to which they might aspire, for their own self-interest and the voters must have an opportunity to approve any redistricting plan adopted by the Legislature.

SECTION 3.   Compensation of Legislators

Article III, Section 8, Subdivision (g) of the California Constitution is amended to read:  ·

(g)   Beginning in the session immediately following the adoption of this Act, the annual salary of all Members of the Legislature shall be reduced to $75,000. On or before December 3, 1990, the commission shall, by a single resolution adopted by a majority of the membership of the commission, establish the annual salary and the medical, dental, insurance, and other similar benefits of state officers. The annual salary and benefits specified in that resolution shall be effective on and after December 3, 1990.

Thereafter, at or before the end of each fiscal year, the commission, shall, by a single resolution adopted by a majority of the membership of the commission, may recommend to the Legislature an adjustment of adjust the annual salary and the medical, dental, insurance, and other similar benefits of state officers. The annual salary and benefits specified in the resolution shall be effective on and after the first Monday of the next December if approved by a statute, passed by roll call vote entered into the journal, a majority of each house of the Legislature concurring and approved by the voters as a Legislative measure at the next regular election.

SECTION 4.   Legislative Travel and Living Expenses.

Subdivision (b) of Section 4 of Article IV of the California Constitution is amended to read:

(b) Travel and living expenses for Members of the Legislature in connection with their official duties shall be prescribed by statute passed by

~~roll call vote entered in the journal, two~~ thirds of the membership of each ~~house concurring.~~ not exceed $75 per day. A Member may not receive travel and living expenses during the times that the Legislature is in recess. ~~for more than three calendar days, unless the Member is traveling to or from, or is in attendance at, any meeting of a committee of which he or she is a member, or a meeting, conference, or other legislative function or responsibility as authorized by the rules of the house of which he or she is a member, which is held at a location at least 20 miles from his or her place of residence.~~ In no case, shall a Member receive travel and living expenses for more than 120 days per year. The amount paid for travel and living expenses may be increased if approved by a statute, passed by roll call vote entered into the journal, a majority of each house of the Legislature concurring and approved by the voters as a Legislative measure at the next regular election.

SECTION 5.    Timely Budget

Subdivision (h) of section 12 of Article IV is added to read:

(h) Notwithstanding any other provision in this constitution, including Sections 4 and 8 of Article III and Sections 4 and 12(c) of this article, in any year in which the budget bill is not passed by the legislature by midnight on June 15, each Member of the Legislature shall forfeit any salary and reimbursement for travel or living expenses during any regular or special session for the period from midnight on June 15 until the day that the budget bill is presented to the Governor. No forfeited salary and travel and living expenses shall be paid retroactively. The amount forfeited can be approved for payment if approved by a statute, passed by roll call vote entered into the journal, a majority of each house of the Legislature concurring and approved by the voters as a Legislative measure at the next regular election.

SECTION 6.    Fair Reapportionment

Article XXI of the California Constitution is amended to read:

Section 1. In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the ~~Legislature~~ Supreme Court shall, adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in conformance with the following standards:

(a) Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single member district.

(b) The population of all districts of a particular type shall be reasonably equal in compliance with Federal law.

(c) Every district shall be contiguous and as compact as possible.

(d) Districts of each type shall be numbered consecutively commencing at the northern boundary of the state and ending at the southern boundary.

(e) The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible ~~without violating the requirements of any other subdivision of this section~~.

The Supreme Court shall appoint a panel of Special Masters made up of retired federal and state judges reflecting the cultural and ethnic diversity of California to hold public hearings to receive the presentation of evidence and argument from the public with respect to proposed plans of reapportionment.

Section 2.  The reapportionment plans adopted by the Supreme Court shall be submitted to the voters for approval at the next regular election. The plans shall be used for all elections unless and until rejected by the voters.

SECTION 7.  Severability

If any part of the measure or the application to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications which reasonably can be given effect without the invalid provision or application.