112 Cal.Rptr.2d 320 (2001)
92 Cal.App.4th 896
The PEOPLE, Plaintiff and Respondent,
v.
Rudy Raymond ABASTA, Defendant and Appellant.
No. B145552.
Court of Appeal, Second District, Division Five.
October 4, 2001.
Review Granted January 3, 2002.
Review Dismissed May 15, 2002.
*321 Cynthia A. Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Marc E. Turchin, Acting Senior Assistant Attorney General, Brad D. Levenson, and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication[*]
TURNER, P.J.

I. INTRODUCTION
Defendant, Rudy Raymond Abasta, appeals from his conviction for attempted murder (Pen.Code,[1] §§ 664, 186, subd. (a)) and findings that he: personally used a dangerous weapon; personally inflicted great bodily injury; and committed the offense for the benefit of, at the direction of, and in association with, a criminal street gang. (§§ 12022, subd. (b)(1), 12022.7, subd. (a), 186.22, subd. (b)(1).) Defendant argues the trial court improperly instructed the jury with CALJIC No. 2.28 and sentenced him pursuant to section 186.22, subdivision (b)(1). In the published portion of this opinion, we address the question of whether Proposition 21 on the March 7, 2000, ballot violates the "single subject rule" of California Constitution, article II, section 8, subdivision (d). We conclude Proposition 21 does not violate the single subject rule.

II. BACKGROUND
We view the evidence in a light most favorable to the judgment. (Jackson v. Virginia (1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560; People v. Osband (1996) 13 Cal.4th 622, 690, 55 Cal. Rptr.2d 26, 919 P.2d 640; Taylor v. Stainer (9th Cir.1994) 31 F.3d 907, 908-909.) On April 14, 2000, Christopher Gibbs, an African-American, was 16 years old. He had just moved to Azusa with his parents. While Mr. Gibbs was walking in his new neighborhood in the early afternoon, he heard a car stop abruptly behind him. Mr. Gibbs turned around and saw defendant get out of the car. Defendant walked towards Mr. Gibbs. Defendant said: "What's up, fool. Where are you from?" Mr. Gibbs testified, "I told him I wasn't from anywhere." Defendant walked up to Mr. Gibbs. Defendant looked toward a nearby house. Mr. Gibbs looked in the same direction. Defendant then stabbed Mr. Gibbs in the back. Defendant ran toward the car. After defendant got into the passenger seat, the car drove away. Mr. Gibbs was able to return to his home before collapsing. Mr. Gibbs was hospitalized for three days. The stab wound penetrated Mr. Gibbs's lung and lacerated his liver. His lung collapsed. Mr. Gibbs positively identified defendant as the assailant at: a photographic lineup; a live lineup; the preliminary hearing; and at trial.
On October 25, 1996, defendant and two other Hispanic individuals assaulted Santoaine Carter and Reginald Prothro, both African-Americans, with a metal pipe outside a 7-Eleven convenience store. Azusa Police Officer Andy Sutcliffe and a partner observed the beating. They stopped their *322 police car and identified themselves. Defendant and his companions ran. They were chased by the officers. All three assailants, including defendant, were arrested.
There was testimony defendant was a gang member. Defendant's gang regularly engaged in murders, robberies, and car jackings. Defendant's gang had a general dislike of African-Americans. Defendant had previously attacked African-Americans. This was consistent with his attack on Mr. Gibbs. Further, when interviewed by the authorities after his arrest, defendant admitted he was on probation for a hate crime.
Defendant testified in his own defense. Defendant denied stabbing Mr. Gibbs. Defendant acknowledged his arrest and guilty plea related to the assault on Mr. Prothro and Mr. Carter. Defendant had moved in with his fiance, Sophia Olmeda Luna in March 2000. Ms. Olmeda Luna lived in Rialto. On the day of his testimony, defendant recalled being at home with his "`mother-in-law,'" Joanne Sanchez-Luna, on April 14, 2000. Defendant remembered having attempted to cheer her because it was the anniversary of her husband's death. Defendant testified that he worked with an individual identified only as "Mr. Mario" doing landscaping later that day. Defendant was a member of a gang which displayed a general dislike for African-Americans in the City of Azusa.
Ms. Olmeda Luna testified that defendant was generally with her every morning and night. She did not remember specifically where defendant was on April 14, 2000. Ms. Olmeda Luna remembered that her mother was upset around that date regarding her deceased father's birthday. Defendant was not present when Ms. Olmeda Luna and Ms. Sanchez-Luna spoke about her father. Ms. Sanchez-Luna testified that defendant was at her home on April 14, 2000. She was depressed that day because a song she heard reminded her of her deceased husband. Defendant tried to cheer her. The birthday of Ms. Sanchez-Luna's husband had been April 12. Defendant had worked earlier that day with Mario Rosas.
As noted previously, defendant was convicted of attempted murder. He received a sentence on the attempted murder charge of nine years. Additionally, he received: a 3-year term for great bodily injury pursuant to section 12022.7, subdivision (a); 10 years because the attempted murder arose out of gang activity pursuant to section 186.22, subdivision (b)(1); and an additional 1-year term for deadly weapon use pursuant to section 12022, subdivision (a). Therefore, defendant's total term was 23 years.

III. DISCUSSION

A. CALJIC No. 2.28[**]
Defendant argues the provisions of Proposition 21, known as "The Gang Violence and Juvenile Crime Prevention Act," adopted by California voters on March 7, 2000, violates the "single subject rule" in article II, section 8, subdivision (d), of the California Constitution which provides: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." The California Supreme Court has held: "`"`[A]n initiative measure does not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are "reasonably germane" to each other,' and to the general purpose or object of the initiative."'" (Senate of the State of Cal. v. Jones (1999) 21 Cal.4th 1142, 1157, 90 Cal. Rptr.2d 810, 988 P.2d 1089, quoting Legislature *323 v. Eu (1991) 54 Cal.3d 492, 512, 286 Cal.Rptr. 283, 816 P.2d 1309, original italics; see also Raven v. Deukmejian (1990) 52 Cal.3d 336, 346, 276 Cal.Rptr. 326, 801 P.2d 1077; Harbor v. Deukmejian (1987) 43 Cal.3d 1078, 1097-1098, 240 Cal.Rptr. 569, 742 P.2d 1290; Amador Valley Joint Union High Sch. Dist. v. State Bd. Of Equalization (1978) 22 Cal.3d 208, 229-230, 149 Cal.Rptr. 239, 583 P.2d 1281.) The California Supreme Court has emphasized that the single subject rule is to be liberally construed. (Brosnahan v. Brown (1982) 32 Cal.3d 236, 241, 186 Cal.Rptr. 30, 651 P.2d 274; Fair Political Practices Com. v. Superior Court (1979) 25 Cal.3d 33, 38-39, 157 Cal.Rptr. 855, 599 P.2d 46.) The Brosnahan court noted that numerous provisions may be united in one proposition if they have one general object indicated in the title. (Brosnahan v. Brown, supra, 32 Cal.3d at p. 246, 186 Cal.Rptr. 30, 651 P.2d 274; Fair Political Practices Commission v. Superior Court, supra, 25 Cal.3d at pp. 38, 41, 157 Cal.Rptr. 855, 599 P.2d 46.) Moreover, in Senate of the State of Cal. v. Jones, supra, 21 Cal.4th at page 1157, 90 Cal.Rptr.2d 810, 988 P.2d 1089, the California Supreme Court explained: "`[T]he single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough that the various provisions are reasonably related to a common theme or purpose.'" (Ibid., quoting Legislature v. Eu, supra, 54 Cal.3d at p. 513, 286 Cal.Rptr. 283, 816 P.2d 1309.) We are required to resolve any reasonable doubts in the favor of the initiative power accorded to the people of our state. (Brosnahan v. Brown, supra, 32 Cal.3d at p. 241, 186 Cal.Rptr. 30, 651 P.2d 274; see also San Mateo County Coastal Landowners' Assn. v. County of San Mateo (1995) 38 Cal.App.4th 523, 553, 45 Cal.Rptr.2d 117.)
In the ballot pamphlet, Proposition 21 was entitled "Juvenile Crime." (Ballot Pamp, Primary Elec. (March 7, 2000) text of Prop. 21, p. 44.) The language of the initiative itself stated its title was the "Gang Violence and Juvenile Crime Prevention Act" of 1998. (Id. at p. 48.) The voter pamphlet cited five areas of concern the initiative was designed to address. All were listed on the first page of the ballot pamphlet. The first area noted was, "Increases punishment for gang-related felonies; death penalty for gang-related murder; indeterminate life sentences for home-invasion robbery, carjacking, witness intimidation and drive-by shootings; and creates crime of recruiting for gang activities; and authorizes wiretapping for gang activities." (Id. at p. 44.) Other areas included: adult trial for juveniles 14 or older charged with murder; elimination of formal probation for juveniles committing felonies; registration for gang related offenses; and the designation of additional crimes as violent and serious felonies. (Ibid.) In the portion of the ballot pamphlet entitled "Overview" prepared by the Legislative Analyst, the following appears: "This measure makes various changes to laws specifically related to the treatment of juvenile offenders. In addition, it changes laws for juveniles and adults who are gang-related offenders, and those who commit violent and serious crimes. Specifically, it: [¶] [] Requires more juvenile offenders to be tried in adult court. [¶] Requires that certain juvenile offenders be held in local or state correctional facilities. [¶] [] Changes the types of probation available for juvenile felons, [¶] Reduces confidentiality protections for juvenile offenders. [¶] Increases penalties for gangrelated crimes and requires convicted gang members to register with local law enforcement agencies. [¶] Increases criminal penalties for certain serious and violent offenses." (Id. at p. 45.)
*324 Additionally, in "FINDINGS AND DECLARATIONS" of Proposition 21, the authors of the initiative stated that it was focused upon the problem of violent juvenile gang criminality. The initiative made specific factual findings concerning the impact and costs of violent juvenile crime.[2] *325 The initiative: criminalized for the first time membership in "any criminal street gang" (§ 182.5); toughened the provisions of the California Street Terrorism Enforcement and Prevention Act (§ 186.22); amended the provisions of section 186.26 relating to the recruitment or solicitation of individuals who actively participate in a criminal street gang; required the registration of persons convicted of using violence to induce an individual to join a street gang (§ 186.30 et seq.); amended the special circumstances statute to include killings by an accused actively participating in a criminal street gang (§ 190.2, subd. (a)(22)); substantially increased the scope of liability and penalties for vandalism which included defacing property with graffiti (§ 594, subd. (b)); amended the wiretap statute to permit eavesdropping in the case of violations of the California Street Terrorism Enforcement and Prevention Act (§ 629.52, subd. (a)(4)); clarified the effective date of changes in sections 667 and 1170.12 (§§ 667.1, 1170.125); broadened the scope of the definition of violent felonies within the meaning of section 667.5, subdivision (c); increased the number of the serious felonies in section 1192.7, subdivision (c); required the prosecution of youths under the general criminal law in enumerated circumstances (Welf. & Inst.Code, § 602, subd. (b)); required reporting the complete criminal history of minors to the Department of Justice (Welf. & Inst.Code, § 602.5); required minors who were arrested for enumerated felonies to be taken before a judicial officer prior to release (Welf. & Inst.Code, § 625.3); reduced the availability of informal supervision to minors (Welf. & Inst.Code, § 654.3); modified the provisions for giving notice of a petition to a minor in juvenile court proceedings and issuance of an arrest warrant (Welf. & Inst.Code, §§ 660, subd. (c); 663, subd. (a)(2)); limited the authority of the court to exclude members of public from juvenile court proceedings (Welf. & Inst.Code, § 676, subds. (c), (e), (g)); narrowed the circumstances where a minor could be found fit for treatment under the juvenile court law (Welf. & Inst. Code, § 707); reduced the barriers to finding a minor in violation of probation (Welf. & Inst.Code, § 777); restricted the circumstances under which a minor's juvenile court record could be sealed (Welf. & Inst. Code, §§ 781, subds. (a), (d), 827.2, subd. (c), 827.5, 827.6); adopted a procedure for deferred entry judgment for minors who had not previously been declared wards of the court and were not charged with serious offenses (Welf. & Inst.Code, § 790 et seq.); and restricted the circumstances under which a minor who had been found unfit could be committed to the youth authority. (Welf. & Inst.Code, § 1732.6, subd. (b).)
We agree with the Attorney General that the provisions of Proposition 21 were reasonably related to the purpose of the initiative to reduce juvenile and gang-related crime. (Raven v. Deukmejian, supra, 52 Cal.3d at pp. 346-349, 276 Cal.Rptr. 326, 801 P.2d 1077 [Proposition 115 does not violate single subject rule]; Brosnahan v. Brown, supra, 32 Cal.3d at pp. 247-253, 186 Cal.Rptr. 30, 651 P.2d 274 [Proposition *326 8 met the "reasonably germane" standard because its several factors share the common objective of promoting the rights of actual or potential crime victims]; Fair Political Practices Commission v. Superior Court, supra, 25 Cal.3d at pp. 41-43, 157 Cal.Rptr. 855, 599 P.2d 46 [the possibility that some voters might vote for the measure despite objections to some parts does not warrant rejection of the reasonably germane test because such a risk is inherent in any initiative containing more than one sentence]; Yoshioka v. Superior Court (1997) 58 Cal.App.4th 972, 993, 68 Cal.Rptr.2d 553 [proposition's primary objective to limit recovery of noneconomic damages for drivers that break the law, including those driving under the influence of alcohol or drugs, uninsured drivers, and drivers committing or fleeing after the commission of a felony]; San Mateo County Coastal Landowners' Assn. v. County of San Mateo, supra, 38 Cal.App.4th at p. 554, 45 Cal.Rptr.2d 117 [the stated purposes of Measure A, the Coastal Protection Initiative, while diverse are directed at the single general purpose of protecting coastal resources].) Defendant's single subject rule challenge to Proposition 21 is without merit.

IV. DISPOSITION
The judgment is affirmed.
We concur: ARMSTRONG, J., WILLHITE, J.[***]
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.A and the heading of III.B.
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[**] See footnote *, ante.
[2] Section 2 of the initiative is entitled "FINDINGS AND DECLARATIONS" and states the following: "The people find and declare each of the following: [¶] (a) While overall crime is declining, juvenile crime has become a larger and more ominous threat. The United States Department of Justice reported in 1996 that juvenile arrests for serious crimes grew by 46 percent from 1983 to 1992, while murders committed by juveniles more than doubled. According to the California Department of Justice, the rate at which juveniles were arrested for violent offenses rose 54 percent between 1986 and 1995. [¶] (b) Criminal street gangs and gang-related violence pose a significant threat to public safety and the health of many of our communities. Criminal street gangs have become more violent, bolder, and better organized in recent years. Some gangs, like the Los Angeles-based 18th Street Gang and the Mexican Mafia are properly analyzed as organized crime groups, rather than as mere street gangs. A 1996 series in the Los Angeles Times chronicled the serious negative impact the 18th Street Gang has had on neighborhoods where it is active. [¶] (c) Vigorous enforcement and the adoption of more meaningful criminal sanctions, including the voter-approved "Three Strikes" law, Proposition 184, has resulted in a substantial and consistent four year decline in overall crime. Violent juvenile crime has proven most resistant to this positive trend, [¶] (d) The problem of youth and gang violence will, without active intervention, increase, because the juvenile population is projected to grow substantially by the next decade. According to the California Department of Finance, the number of juveniles in the crime-prone ages between 12 and 17, until recently long stagnant, is expected to rise 36 percent between 1997 and 2007 (an increase of more than one million juveniles). Although illegal drug use among high school seniors had declined significantly during the 1980s, it began rising in 1992. Juvenile arrest rates for weapons-law violations increased 103 percent between 1985 and 1994, while juvenile killings with firearms quadrupled between 1984 and 1994. Handguns were used in two-thirds of the youth homicides involving guns over a 15-year span. In 1994, 82 percent of juvenile murderers used guns. The number of juvenile homicide offenders in 1994 was approximately 2,800, nearly triple the number in 1984. In addition, juveniles tend to murder strangers at disproportionate rates. A murderer is more likely to be 17-years-old than any other age, at the time that the offense was committed. [¶] (e) In 1995, California's adult arrest rate was 2,245 per 100,000 adults, while the juvenile arrest rate among 10 to 17 year olds was 2,430 per 100,000 juveniles, [¶] (f) Data regarding violent juvenile offenders must be available to the adult criminal justice system if recidivism by criminals is to be addressed adequately. [¶] (g) Holding juvenile proceedings in secret denies victims of crime the opportunity to attend and be heard at such proceedings, helps juvenile offenders to avoid accountability for their actions, and shields juvenile proceedings from public scrutiny and accountability. [¶] (h) Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity. [¶] (i) The rehabilitative/treatment juvenile court philosophy was adopted at a time when most juvenile crime consisted of petty offenses. The juvenile justice system is not well-equipped to adequately protect the public from violent and repeat serious juvenile offenders. [¶] (j) Juvenile court resources are spent disproportionately on violent offenders with little chance to be rehabilitated. If California is going to avoid the predicted wave of juvenile crime in the next decade, greater resources, attention, and accountability must be focused on less serious offenders, such as burglars, car thieves, and first time non-violent felons who have potential for rehabilitation. This act must form part of a comprehensive juvenile justice reform package which incorporates major commitments to already commenced "at-risk" youth early intervention programs and expanded informal juvenile court alternatives for low-level offenders. These efforts, which emphasize rehabilitative protocols over incarceration, must be expanded as well under the provisions of this act, which requires first time, non-violent juvenile felons to appear in court, admit guilt for their offenses, and be held accountable, but also be given a non-custodial opportunity to demonstrate through good conduct and compliance with a court-monitored treatment and supervision program that the record of the juvenile's offense should justly be expunged. [¶] (k) Dramatic changes are needed in the way we treat juvenile criminals, criminal street gangs, and the confidentiality of the juvenile records of violent offenders if we are to avoid the predicted, unprecedented surge in juvenile and gang violence. Californians deserve to live without fear of violent crime and to enjoy safe neighborhoods, parks, and schools. This act addresses each of these issues with the goal of creating a safer California, for ourselves and our children, in the Twenty-First Century." (Ballot Pamp., Primary Elec. (March 7, 2000), supra, p. 119.)
[***] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.